UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------x

RIVKA MANDEL,                                                               :

                              Plaintiff,                  :    1:23-cv-07352 (RER) (VMS)

                              - against -                 :

JACOB DASKAL; BELLA DASKAL; PEARL DEMBITZER;    :
LEIBY DEMBITZER; CHAYA BORNSTEIN; SHULEM        :
BORNSTEIN; CHAIM DASKAL; ESTHER BRODY;          :
ROSE TEITELBAUM; BENZION DASKAL; SOLOMON        :
DASKAL; BARRY DASKAL; CHAVI FISCHBEIN; ISAAC    :
FISCHBEIN; BORO PARK SHOMRIM; BAIS YAAKOV       :
HIGH SCHOOL OF CHICAGO; CRAINDELL Z. MANNES;    :
RABBI BEN ZION HALBERSTAM; CHAIM S.             :
HALBERSTAM; CONGREGATION SHAAREI ZION OF        :
BOBOV; RABBINICAL COLLEGE BOBOVER YESHIVA       :
BNEI ZION; LIPA "NUSSY" BRAUNER; MUTTY          :
BRAUNER; YAD EPHRAIM a/k/a EZRAS CHOLIM YAD     :
EPHRAIM; PESACH GREENBERG; YACHAD D'BOBOV;      :
and CHAIM FLEISCHER,                            :

                            Defendants.                 :

------------------------------------------------------------------------------x

## PLAINTIFF RIVKA MANDEL'S OMNIBUS LEGAL MEMORANDUM IN OPPOSITION TO THE DEFENSE MOTIONS PURSUANT TO FED. R. CIV. P. 12

PAUL BATISTA, P.C.
*Attorney for Plaintiff Rivka Mandel*
26 Broadway, Suite 1900
New York, New York 10004
(631) 377-0111
Batista007@aol.com

## TABLE OF CONTENTS

**Pages**

**Table of Contents** .................................................................................................(i)

**Table of Authorities** ...........................................................................................(ii)

**Summary and Introduction**.................................................................................2

   **A.**  **The Nature of the Litigation**..................................................................2

   **B.**  **The Underlying Allegations**.................................................................2

   **C.**  **The Findings of United States District Judge Garaufis** ...................5

   **D.**  **The State Indictment of Daskal** ........................................................6

   **E.**  **The Federal Indictment of Daskal** ...................................................7

   **F.**  **The Conviction**....................................................................................8

   **G.**  **Daskal's Guilty Plea** ..........................................................................9

   **H.**  **The Events at the Sentencing** ..........................................................11

      **(i)**   **Overview of the Sentencing** .................................................11

      **(ii)**  **The Attempt of the Bobover Community to Intervene in the Sentencing** ..............................................11

      **(iii)** **Ms. Mandel's Victim Impact Statement** ...........................12

      **(iv)** **Daskal's Further Admissions of Liability and Plea for "Mercy"**..........................................................14

      **(v)**  **The Court's View of the Responsibility of the Community**.............................................................15

      **(vi)** **Daskal's Wealth and the Complicity of the "Community"** .......................................................15

**Argument** .................................................................................................................. 18

    **A.**    **The Amended Complaint Fully Satisfies the Relevant Pleading Standards** .......................................................... 18

    **B.**    **The Core Allegations of the Amended Complaint Extend to the Additional Defendants** .............................................. 19

    **C.**    **"Aiding and Abetting" Standards Extend Liability to the Additional Defendants** ............................................ 23

    **D.**    **The Amended Complaint Does Not Require a "More Definite Statement"** ........................................................ 24

    **E.**    **The Court Should Retain Supplemental Jurisdiction over the State Law Counts** ................................................ 24

**Conclusion** ................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGES**

*Ashcroft* v. *Iqbal*,
    556 U.S. 544, 129 S. Ct. 1937,
    173 L. Ed. 2d 868 (2009) ...................................................................................18

*Barrett* v. *Forest Laboratories*, *Inc.*,
    39 F. Supp. 3d 407 (S.D.N.Y. 2014) ...................................................................19

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544, 127 S. Ct. 1955,
    167 L. Ed. 2d 929 (2007) ...................................................................................18

*Central Bank of Denver, N.A.* v.
*First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ......................................................................................20, 23

*DiVittorio* v. *Equidyne Extractive Industries, Inc.*,
    822 F. 2d 1242 (2d Cir. 1987) ............................................................................19

*Elden* v. *Nirvana LLC*,
    88 F. 4th 1292 (9th Cir. 2023) ............................................................................22

*Hardaway* v. *Hartford Public Works Department*,
    879 F. 3d 486 (2d Cir. 2018) ..............................................................................18

*Jane Doe No. 8* v. *Royal Caribbean Cruises Ltd.*,
    860 F. Supp. 2d 1337 (S.D. Fla. 2022) ...............................................................21

*T.D.P.* v. *Choice Hotels International, Inc.*,
    __ F. Supp. 3d __, 2024 WL 1256053 (S.D. Ohio 2024)................................2, 21

| STATUTES AND RULES | PAGES |
|---|---|

18 U.S.C. §2 ............................................................................................................23

18 U.S.C. §2255 ..............................................................................................2, 19, 20

28 U.S.C. §1367 ......................................................................................................24

Fed. R. Civ. P. 12(b)(6) .......................................................................................18, 22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------x

RIVKA MANDEL,                                                        :

                                                                  :   1:23-cv-07352 (RER) (VMS)

                                  Plaintiff,              :

                                                          :

                          - against -                :

                                                             :

JACOB DASKAL; BELLA DASKAL; PEARL DEMBITZER;   :
LEIBY DEMBITZER; CHAYA BORNSTEIN; SHULEM
BORNSTEIN; CHAIM DASKAL; ESTHER BRODY;          :
ROSE TEITELBAUM; BENZION DASKAL; SOLOMON
DASKAL; BARRY DASKAL; CHAVI FISCHBEIN; ISAAC   :
FISCHBEIN; BORO PARK SHOMRIM; BAIS YAAKOV
HIGH SCHOOL OF CHICAGO; CRAINDELL Z. MANNES;   :
RABBI BEN ZION HALBERSTAM; CHAIM S.
HALBERSTAM; CONGREGATION SHAAREI ZION OF       :
BOBOV; RABBINICAL COLLEGE BOBOVER YESHIVA
BNEI ZION; LIPA "NUSSY" BRAUNER; MUTTY         :
BRAUNER; YAD EPHRAIM a/k/a EZRAS CHOLIM YAD
EPHRAIM; PESACH GREENBERG; YACHAD D'BOBOV;     :
and CHAIM FLEISCHER,

                                                             :

                                  Defendants.          :

------------------------------------------------------------------------------x

### PLAINTIFF RIVKA MANDEL'S OMNIBUS LEGAL MEMORANDUM IN OPPOSITION TO THE DEFENSE MOTIONS PURSUANT TO FED. R. CIV. P. 12

       Plaintiff Rivka Mandel respectfully submits this single omnibus legal memorandum in opposition to the multiple motions for dismissal under Fed. R. Civ. R. 12(b) filed by the appearing defendants. Because the motions to dismiss, although advanced separately by the moving defendants' separate counsel, all raise the same core arguments, Ms. Mandel will address the multiple motions in this memorandum, focusing her opposition on the shared arguments and, where appropriate, any discrete individual issues unique to any of the defendants who have raised those issues.

**Summary and Introduction**

A.    *The Nature of the Litigation*

At the outset, it is vital to emphasize the essence of the claims advanced by Ms. Mandel in the Amended Complaint (the "AC") and the genesis of those claims based on the views forcefully articulated by United States District Judge Nicholas Garaufis at the October 11, 2023, sentencing of defendant Jacob Daskal ("Daskal"), who was sentenced on that day to 17.5 years of imprisonment for the repeated rape and sexual abuse of Ms. Mandel when she was 15 years old.[1]

As the Amended Complaint alleges, Judge Garaufis did not confine himself to insightful and clearly stated conclusions about the heinous nature of Daskal's criminal conduct. He also plainly expressed the view that members of the community of which Daskal was a highly prominent member bore responsibility for Daskal's conduct. The additional defendants include individuals and institutions encompassed in Judge Garaufis' statements who bear responsibility for Daskal's conduct.

B.    *The Underlying Allegations*

Ms. Mandel, beginning when she was 15 years old, was consistently and remorselessly raped, sodomized, sexually harassed, and criminally intimidated and threatened by Daskal, who for decades has been a highly prominent member of a religious and social community in a position of alleged trust, honor and reverence in that community. His criminal acts against a child took place in a stunning variety of places – in his own homes with his wife, children and others present yet voicing no objection, attempting no intervention, and communicating no

---

[1] Later segments of this memorandum reveal that the central argument advanced by all the moving defendants – namely, defendants' sweeping argument that the key federal statute on which Ms. Mandel's claims against defendants rests, 18 U.S.C. §2255, does *not* extend to anyone other than the perpetrator of the offenses – is, quite simply, wrong. Instead, liability under the statute extends to aiders-and-abettors, facilitators, and others who assisted the offender. *See, e.g., T.D.P.* v. *Choice Hotels International, Inc.*, ___ F. Supp. 3d ___, 2024 WL 1256053 (S.D. Ohio March 25, 2024).

2

concerns to law enforcement or other Governmental authority, in various locations in New York and other states to which Daskal transported Ms. Mandel.

Moreover, Daskal's crimes were aided and abetted, facilitated, and concealed by the other defendants identified in the Amended Complaint, as Judge Garaufis specifically described at the October 11, 2023, sentencing. *See* AC ¶90.[2] The additional named defendants and others whose identities will be revealed through the use of federal disclosure procedures provided collective communal assistance to Daskal by criminal acts (i) to deter Ms. Mandel from seeking vindication for the crimes she suffered and to silence her through attempts of bribery and threats of violence and acts of violence against her and (ii) corruptly to deter her from providing information as to Daskal's pattern, practice, and history of sexual assault and abuse of many other young women to whom defendants and other community members provided access to Daskal to groom those children in order to achieve Daskal's sexual abuse and exploitation of them.

Daskal's crimes are not a matter of conjecture or speculation. Instead, his crimes are conclusively determined. In connection with the highly publicized federal indictment of him, he pleaded guilty on July 14, 2023, to offenses against Ms. Mandel before Judge Garaufis. During the July 14, 2023 guilty plea, Daskal provided some, but by no means complete, admissions of his repeated criminal activity against Ms. Mandel.

In addition, at the October 2023 sentencing, Daskal under oath made definitive admissions of the criminal acts he committed and unequivocally conceded that he had severely

---

[2] Judge Garaufis stressed: "I find myself wondering how something like this could happen. How defendant's heinous crimes could go on for so long without someone stepping in to stop him and to help the victim? How could he inflict such damage believing he could get away with it?" (AC ¶90) The Court also repeatedly focused on the role of the "community" of which Daskal was such a prominent member: "[Daskal] did not commit his crimes in a vacuum. *Those who knew or suspected and did nothing, including family, friends and clergy alike[,] are also morally at fault.* Those who did not believe the victim or chose to look away, including educators, among others, are morally at fault…Those who enabled Mr. Daskal are morally at fault….This is a community and the community has to take responsibility and not hide from responsibility." (*Id.* (emphasis supplied.))

harmed Ms. Mandel.  Collectively, Daskal's sworn statements, although not complete or fully candid, conclusively establish his liability to her for the civil and criminal violations alleged in the Amended Complaint and for the enormous emotional and financial damage he has inflicted on her for which this civil action demands recovery from him, the other defendants and others, as well as the punitive damages to which express federal legislation entitles her.

Furthermore, as to the other defendants and others whose identities will be revealed through federal disclosure procedures, Judge Garaufis at the October 2023 sentencing made clear that the other defendants identified in this litigation and others bear responsibility for creating and maintaining a regime of terror, silence, and intimidation which is wholly consistent with the operation of enterprises that generate fear, a code of *omerta*, and a system of revenge and intimidation.  As the United States Attorney's Office itself publicly stressed: "Daskal, who was almost 60 years old when these crimes were committed, exploited the vulnerability of a young teenager by grooming her for sex and enticing her into having sexual relations with him...."  (AC ¶42)  And Breon Peace, the United States Attorney for the Eastern District of New York, publicly announced that the "defendant has admitted he abused his power, trust and position in the community by committing deplorable acts against a child in his care."  *Id.*

Ms. Mandel's civil action is, in effect, a vehicle set in motion by Judge Garaufis' carefully formulated view that "[t]hose who enabled Mr. Daskal are morally at fault" and that "the community has to take responsibility and not hide from responsibility."  *See* AC ¶90 (*quoting* the Court's comments).

The "responsibility" of the community described by Judge Garaufis will, at least in part, be vindicated by compelling Daskal and the community which enabled his conduct to compensate Ms. Mandel by the entry of substantial financial judgments against him, the other

4

named defendants, and others, and the illicit transfer from Daskal to the other named defendants, and others whose identities will be revealed through pre-trial discovery.

C.    *The Findings of United States District Judge Garaufis*

In a highly detailed 54-page Memorandum and Order filed on June 9, 2023, Judge Garaufis stressed the broader factual context:

- From approximately August 2017 through November 2017, Daskal initiated and pursued a pervasive campaign of sexual abuse of Ms. Mandel.

- Among other things, "Daskal is the founder and chief of the Boro Park Shomrim Society, a private, Orthodox Jewish crime-patrol group."

- Judge Garaufis further determined that Daskal, in or about June 2017, "offered to have [Ms. Mandel] stay with his family at his summer home in South Fallsburg, New York…[and Ms. Mandel] moved in shortly thereafter."

- In "August 2017…Daskal began to sexually abuse [Ms. Mandel]" and the "abuse continued…over the summer…."

- Daskal also consistently coerced Ms. Mandel, who was 15, into silence. Judge Garaufis emphasized: "Daskal also told [Ms. Mandel] that 'no one should see what we do' and that she should not tell anyone about the abuse because 'it's just going to ruin your life.' Daskal and [Ms. Mandel] later returned to Brooklyn where he continued to engage in sexual activity with [Ms. Mandel] and sent her text messages describing his sexual fantasies."

- Judge Garaufis in addition noted that Daskal's illegal conduct was not confined to locations in New York only. More specifically, in October 2017, Ms. Mandel, "with the assistance of Daskal," enrolled in a high school in Chicago, Illinois.

- While Ms. Mandel was in Chicago, Daskal and she "shared sexually explicit text messages and Skype video chats while apart."

- Daskal's activities were not limited to text messages and Skype video chats. In November 2017 Daskal also "traveled" to meet Ms. Mandel in Chicago, "when they again engaged in sexual activity."

- When Ms. Mandel disclosed Daskal's conduct to a classmate at the school in Chicago, Ms. Mandel was "expelled" from the school and "sent back to Brooklyn."

- When Ms. Mandel was "sent to live in Israel, Daskal continued to communicate with [Ms. Mandel] over social media."

- In yet another aspect of his conduct, Daskal demanded that Ms. Mandel "write a letter stating that they engaged in sex as part of 'therapy' and that she loved him, hoping that this letter would exonerate him if his abuse was discovered."

- In an indication of the prominent role he played in the community of which the other defendants are members, "Daskal also repeatedly told [Ms. Mandel] about his connections to police, stature in the Jewish community, and that he would deny any allegations that she made against him."

D.     *The State Indictment of Daskal*

Daskal was originally indicted on May 11, 2018, in the Supreme Court of the State of New York, Kings County (the "State Indictment"). The State Indictment discloses in vivid detail by reference to dates, conduct and locations certain aspects of Daskal's criminal activity against Ms. Mandel as identified by the Grand Jury. The State Indictment [Indictment No. 3569-2018] charged, with great specificity, in twenty detailed counts, the crimes of (1) "Rape in the Third Degree [PL 130.25(2)] in August 2017," (2) "Criminal Sexual Act in the Third Degree" involving "contact between the penis [of Daskal] and the mouth of Ms. Mandel," (3) "Criminal Sexual Act in the Third Degree" involving "contact between the mouth [of Daskal] and the vagina" of Ms. Mandel, (4) "Sexual Misconduct [PL 130.20(1)]" consisting of "sexual intercourse" by Daskal with Ms. Mandel, and (5) "Endangering the Welfare of a Child [PL 260.10(1)] by knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of…a child…"

E.      *The Federal Indictment of Daskal*

In the wake of the State Indictment, federal investigators opened an investigation into Daskal in November 2018 (the "Federal Investigation"). The Federal Investigation resulted in the initial federal indictment of Daskal on February 26, 2021 (the "Initial United States Indictment"). Daskal was criminally charged in the Initial United States Indictment with:

(i)      Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. §§2444(b) and 3551;

(ii)     Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. §§2423(b) and 3551; and

(iii)    Travel with Intent to Engage in Illicit Sexual Activity, in violation of 18 U.S.C. §§2423(b) and 3551.

Among other things, the Initial United States Indictment explicitly charged Daskal with "violations of New York Penal Law Sections 130.25 (2) (Rape in the Third Degree) and 130.40 (2) (Criminal Sex Act in the Third Degree), in that [Daskal] engaged in sexual intercourse and oral sexual conduct with [Ms. Mandel], who had not yet attained the age of 17 years...using one or more facilities and means of interstate commerce."

Significantly, as Ms. Mandel's Amended Complaint alleges, Daskal, while under federal indictment, recruited individuals to coerce, threaten, bribe and intimidate Ms. Mandel into ceasing to cooperate with federal agents and prosecutors in order to enable Daskal to avoid criminal liability. In other words, Daskal and others, including those identified as defendants in the Amended Complaint, orchestrated a multi-pronged campaign to "silence" Ms. Mandel and to obstruct the investigation and prosecution of Daskal.

Through the acts of the individuals and entities Daskal and his co-horts recruited while Daskal was under indictment and awaiting trial scheduled for July 17, 2023, defendants sought to eviscerate the Government's prosecution of him by coercing, intimidating, and seeking

to bribe Ms. Mandel into silence by her withdrawal of assistance from the prosecution. For example, the individuals recruited by Daskal slashed the tires of Ms. Mandel's car and sought to have her meet with a New York lawyer in an effort, which Ms. Mandel rejected, to receive as a bribe significant sums of money to dissuade her from testifying.

Ms. Mandel, although she was placed in fear by the acts of the individuals recruited by Daskal and those associated with him, never wavered in her complete cooperation with federal agents and prosecutors and continued to prepare for the trial scheduled for July 17, 2023.

F.    *The Conviction*

On July 14, 2023, three days before the jury selection scheduled for July 17, 2023, Mr. Peace, the United States Attorney for the Eastern District of New York, filed a letter (the "U.S. Attorney's letter") with Judge Garaufis to "inform the Court" that the United States and Daskal had "agreed that [Daskal] would plead guilty to the superseding indictment [filed on June 16, 2023] for transporting a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §2423(a), and be sentenced to a sentence within the Guidelines range of 168 to 210 months' imprisonment, followed by a period of supervised release of five years."

In summarizing the "[p]rocedural [p]osture" of the prosecution, the U.S. Attorney's letter explained that Daskal "is charged on a two-count superseding indictment for using an interstate facility to engage in illicit sexual conduct, in violation of 18 U.S.C. §2423(b)…and transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §2423(a)…for sexually abusing a 15-year-old girl in his care when he was 58 years old."

According to the U.S. Attorney's letter, the "agreed-upon range of 168-210 [*i.e.*, 14 years to 17.5 years] months' imprisonment followed by a 5-year term of supervised release appropriately balances [Daskal's] criminal history and the seriousness of [Daskal's] conduct.…"

The letter stressed that Daskal's conviction "carries a 10-year mandatory minimum...and the...plea accounts for this statutory mandatory minimum and ensures that [Daskal] appropriately faces punishment for the serious crimes he committed."

G.    *Daskal's Guilty Plea*

On July 14, 2023, Daskal entered a plea of guilty, which Judge Garaufis accepted. Judge Garaufis also set October 11, 2023, as the date for the sentencing of Daskal. More specifically, as the full transcript of the July 14, 2023, guilty plea reveals, Daskal admitted under oath to acts of criminal abuse of Ms. Mandel. Although Daskal's admissions were not full and completely candid, the transcript contains the following information confirming Daskal's criminal acts:

> THE COURT [Judge Garaufis]: Mr. Daskal, do you understand, having been sworn to tell the truth, you must do so. If you were to deliberately lie in response to any question I ask you, you would face further criminal charges for perjury.
>
> Do you understand that?
>
> THE DEFENDANT: Yes.
>
> *    *    *
>
> THE COURT: Is your mind clear as you sit here today?
>
> THE DEFENDANT: Yes.
>
> THE COURT: ...Quote, Count 2: Transportation of a minor with intent to engage in criminal sexual activity. In or about August 2017 within the Eastern District of New York and elsewhere, the defendant, Jacob Daskal, did knowingly and intentionally transport [Ms. Mandel], an individual who had not yet attained the age of 18 years, in interstate commerce, to wit: From South Fallsburg, New York, through New Jersey, to Brooklyn, New York, with the intent that such individual [Ms. Mandel] engage in sexual activity for which a person [*i.e.*, Daskal] can be charged with a criminal offense, to wit: Violations of New York Penal Law Sections 130.25(2) (rape in the third degree), and 130.40(2) (criminal sexual act in the third degree) in that Daskal transported [Ms. Mandel]...from South

9

Fallsburg, New York, through New Jersey to Brooklyn, New York…for the purpose of engaging in sexual intercourse and oral sexual conduct with [Ms. Mandel]….

\* \* \*

THE COURT: Mr. Daskal, do you understand the elements of the crime that the Government would have to prove to a jury, beyond a reasonable doubt, and unanimously, in order to convict you of this crime, if you decided to go to trial?

THE DEFENDANT: Yes, Your Honor.

Furthermore, Judge Garaufis conducted a detailed allocution from Daskal.  The Court clearly expressed the situation:

THE COURT: But I need to hear what he [*i.e.*, Daskal] has to say.

You know, I am not going to a store and buying something without seeing what it is.  I need to see what he is going to allocute to and how….And then once I have satisfied that he has properly allocuted to it, I will accept his allocution and I will accept the plea subject to 11(c)(1)(C) and that will be the end of it.

\* \* \*

THE COURT: I am not going to wait beyond today.  It is going to happen today or we are going to trial…

So, are you ready to plead, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: …Mr. Daskal, how do you plead to the charge contained in…the superseding indictment charging you with the transportation of a minor with intent to engage in criminal sexual activity[:] guilty or not guilty?

THE DEFENDANT: Guilty.

\* \* \*

THE COURT: …At this time I would like you to tell me, in your own words, what you did to commit the crime charged [in] the superseding indictment.

10

THE DEFENDANT: In August 2017, I transported [Ms. Mandel], who I knew to be 15 years old, from South Fallsburg, New York to Brooklyn, New York through New Jersey, with intent to engage in oral sex with [Ms. Mandel]. I was 58 years old at the time.

## H.    *The Events at the Sentencing*

### (i)    *Overview of the Sentencing*

Viewed in perspective, the October 11, 2023, sentencing of Daskal was a spectacle which shed deplorable light on Daskal and the literally dozens of individuals who attended the sentencing as a macabre cheering section for Daskal.

In contrast, only the victim – Ms. Mandel herself – was present to bear witness to the truth and the interests of justice not just for herself but for multiple other women who were victims of Daskal and the callous community of his supporters and enablers. Significantly, several of the defendants identified in the Amended Complaint submitted letters as part of Daskal's sentencing memorandum. Among the additional defendants who submitted statements in support of Daskal were defendants Chaya Bornstein, Esther Brody, Barry Daskal, Bella Daskal, Benzion Daskal, Chaim Daskal, Solomon Daskal, Pearl Dembitzer, Rose Teitelbaum, Chaim Fleischer, Yad Ephraim, Rabbi Pesach Greenberg (the founder of defendant Ezras Cholim Yad Ephraim), Chaim Halberstam, and defendant Ben Zion Halberstam (who described himself as the Grand Rabbi of the "Bobov Hassidic Dynasty and communities").

Judge Garaufis perceptively emphasized during the course of the lengthy sentencing that not a single person among the legions of supporters of Daskal – a convicted felon and sexual predator – uttered a single word of empathy, sympathy or concern for Ms. Mandel.

### (ii)    *The Attempt of the Bobover Community to Intervene in the Sentencing*

Even as the sentencing proceedings began, the self-described "Bobover" community attempted to intervene in, and to delay, the sentencing. In words that were highly

11

revealing of the complicity of the additional defendants in Daskal's conduct, an attorney retained

on the very evening before the sentencing made these comments to Judge Garaufis (*see* sentencing

transcript ("Tr.") at 6):

> Last evening, myself [*sic*] and [another lawyer] was [*sic*] approached by members of *the Bobover community*, and they *wanted to have an opportunity, as a community, to have their position heard as it relates to sentencing and Your Honor's obligation to take everything into consideration to arrive at a fair and just sentence.*
>
> Letters have been given, but not by the community as a whole, and I think it would be incumbent on Your Honor to get the position of the community…and to get input from…the membership in order for Your Honor to arrive at his decision… [Tr. 6-7 (emphasis supplied).]

Judge Garaufis rejected this gambit by the "Bobover community" to inject itself

into the sentencing process and to delay the sentencing.

    *(iii)*    *Ms. Mandel's Victim Impact Statement*

Ms. Mandel, when invited to do so, provided a detailed and moving Victim Impact

Statement at the sentencing.  The impact statement, which contains disturbing details as to the

conduct not only of Daskal but the additional defendants, was as follows:

> I ended up leaving home at the age of 15.  I was taken to Jacob Daskal's home, and he was the leader of the Brooklyn Shomrim patrol group.  He offered to help me and I started feeling immense gratitude towards Mr. Daskal.  I viewed him as my savior and father figure.  Mr. Daskal kept in touch with me and eventually offered that I come live with his family.  I was thrilled and unsuspectingly accepted his offer.
>
> I lived with Mr. Daskal and his wife for a couple of months. At the start, he was extremely nice and won my total trust, a process which I now know is called grooming.
>
> When he explained why it is in my benefit to be touched, I believed and trusted him.  The words "sex," "molestation" or "rape" had never entered my vocabulary.  His initial physical affection quickly turned into full-fledged rape.  While Mr. Daskal's nightly

rape sessions caused a considerable amount of confusion and anguish, I insisted that I wanted to attend an out-of-town high school and Mr. Daskal reluctantly helped me transition to the Chicago community.

The weeks I spent in Chicago were the best weeks I have ever experienced in my life. I enjoyed school and was doing great in my studies. After a few short weeks Mr. Daskal came to visit me to check up on me. I am still not sure what the family I was boarding at thought of his visit and why they allowed it, but I soon found myself in the hotel room being raped all over again. When I returned home, a curious friend started probing me about our relationship. Since my friend was more educated than myself in areas of sexual relationships, she knew what questions to ask and after a lot of probing figured out some of what was happening between Mr. Daskal and me. My friend tattled on me to the principal of our school and to my horror, I was promptly kicked out for the religious violation of having sex. I still cannot fathom why no one reported this to the authorities.

I finally started to process what had happened to me. In an act of self-desperation, I tried to block Mr. Daskal out of my life. I enrolled in an online high school and focused on my studies. I completed my studies and received my high school diploma....

Mr. Daskal harassed me and was stalking me whenever I ventured outside. I turned to Amudim, an organization dedicated to helping people who are struggling with any type of abuse. The staff at Amudim was extremely supportive and walked me through the process of reporting the abuse and pressing charges against Mr. Daskal. Mr. Daskal was arrested the very next day. A silver lining in my difficult journey has been the knowledge that my reporting was a crucial step in removing a dangerous predator off the streets....

Although I am trying very hard to move forward in my life...it is something that I live with every day. *What affected me the most was the fact that I was entrusted to Jacob Daskal's care as a minor* and I trusted him to protect me and he violated that trust in the worst ways possible. This is something that has a major effect on my every relationship to this very day. I live with the trauma of what he has done to me physically and emotionally every day. My life will never be the same again. This horrendous experience has shaped me in so many ways. The guilt and shame I live with are the worst feelings that eat at me day and night. And I know that what happened wasn't my fault. However, to live with the pain of

knowing that you were stripped of your youth in such a vile and degrading way is something that stays with you forever.

I don't know how a man takes pleasure in raping and sexually abusing a young child as myself who knew nothing about sexual relations. Jacob Daskal is a very sick man. The pain he has caused me cannot adequately be put into words. When I look at my future, I do not see myself ever being able to be in a healthy trusting relationship with a man. I pray to God that it changes over time because I don't want to be stay alone for the rest of my life. This is all a result of the damage inflicted on me by Jacob Daskal. He wanted me to believe that I belonged to him and that he was going to control my entire life and that I was never going to be able to break free from his grasp. I thank our law enforcement for helping me get away from this man. But the repercussions are something I live with every day. The abuse was a lot more than just sexual abuse. He abused me mentally, emotionally, and sexually all the time fully aware of the fact that he was taking advantage of a vulnerable child. The crimes he committed against me are something that can never be undone. I will live with the pain of this trauma forever. [Tr. 20-24 (emphasis supplied).]

(iv)    *Daskal's Further Admissions of Liability and Pleas for "Mercy"*

At the sentencing, Judge Garaufis gave Daskal himself the opportunity to address the Court before the imposition of the sentence. Daskal accepted that opportunity and, although pleading for "mercy," made unequivocal admissions of liability and responsibility for damage to Ms. Mandel.

Daskal's statements at sentencing included the following:

THE DEFENDANT: …[The] first thing I want to say to the victim [*i.e.*, Ms. Mandel], I cannot express how sorry I am for what I did. I do not know [how] I can ever repay her for the terrible damage that I caused her. For a young girl, the harm that she has to deal with the rest of her life, words cannot capture…the overwhelming regret and shame for what I did.…*[W]hatever I feel is nothing compared to the awful pain I caused [Ms. Mandel].* Your Honor, I'm here to accept responsibility for my crime. *I took advantage of my position in Shomrim to do something unspeakable.* (Tr. 35-36; emphasis supplied.)

14

In the wake of these admissions, Daskal turned to a litany of self-justifying statements about the condition of his "elderly mother" (Tr. at 36), his allegedly ill wife (Tr. at 37), his conversations with his Rabbi (Tr. at 37), and his desire for forgiveness from God (Tr. at 37).

     *(v)*    *The Court's View of the Responsibility of the Community*

After listening to Daskal's statement in full, Judge Garaufis directed highly courageous and pertinent comments to the large group of Daskal's "community" supporters in the courtroom:

> THE COURT: Let me start by stating that we would not be here today but for the courage of the victim [Ms. Mandel]. *Had she not come forward, [Daskal's] crimes may never have come to light and he may have had the opportunity to prey on other young women in the community.* It's horrible and unfair that the victim was forced into this position. She bore the immense burden for coming forward and disclosing the harm she suffered at the hands of a prominent member of her community. But bear this burden she did. The Court commends the victim for her remarkable strength and resilience. (Tr. at 38; emphasis supplied.)

Judge Garaufis' statement included the following:

> The Court agreed to accept this plea because the victim would be spared the need to testify in open court about what was done to her. And, in a sense – in a very great sense – the victim provided to the defendant the mercy the defense asks me to provide to the defendant. It is not my mercy that we must deal with here. It is the mercy that [Ms. Mandel] gave the defendant, because had this defendant gone to trial…his sentence could have been as long as life in prison. [Tr. at 38.]

     *(vi)*    *Daskal's Wealth and the Complicity of the "Community"*

The Court's observations also encompassed other crucial issues of relevance to Ms. Mandel's Amended Complaint: (i) Daskal's illicit transfer of wealth and (ii) the complicity of the "community" of which Daskal was a very prominent leader:

> THE COURT: [Daskal] was a [man] with intense power in his community. He was the leader of the Borough Park Shomrim Society, a crime patrol group with close ties to the New York City

Police Department. *He managed a successful real estate company that brought him substantial wealth. He had a vast network of friends and family.* He was known and respected by many.

> *I would point out that he placed over $10 million in assets…for the benefit of his children and grandchildren. He was a wealthy man.…*

> And what did the defendant do with this power? He abused it to take advantage of a vulnerable young child in his community who was in great need of support because of her special circumstances in her own family and he did so in the most heinous manner imaginable. At every stage of this crime, [Daskal] abused his power. The victim was a 15-year-old and was brought to the defendant because he was an influential member of the community. She trusted him to provide her safe haven and support, looking to him as a father figure. Rather than providing this safe haven, the defendant abused her trust and groomed her for sex. [Tr. at 38-39; emphasis added.]

Judge Garaufis also made crucial observations about the role of the "community" as a whole:

> THE COURT: …While the abuse was ongoing, he attempted to create a paper trail to protect himself, and when the victim finally realized what had been done to her, the defendant used his position of power to threaten and silence her.

> I have read the sentencing memoranda.…I've also read the more than 20 letters submitted in support of Mr. Daskal. They paint a picture of the defendant as a pillar for his…community.…

> I find myself wondering how something like this could happen. *How the defendant's hideous crimes could go on for so long without someone stepping in to stop him and to help the victim? How could he inflict such damage believing he could get away with it?*

> The defendant is clearly a sick man.…*He did not commit his crimes in a vacuum. Those who knew or suspected and did nothing, including family, friends, and clergy alike are also morally at fault.* Those who did not believe the victim or chose to look away, including educators, among others, are morally at fault.…Those who enabled Mr. Daskal are morally at fault. Those who punished the victim when she came forward are morally at fault.

*This is a community and the community has to take responsibility and not hide from responsibility.* The purpose of fostering community cohesion should be working to support and protect the weak and the vulnerable, not to empower and enable wrongdoers who take advantage of those who need our help the most.

The Court hopes that any community members who in any way allowed this to happen or who helped the defendant evade responsibility for so long are listening today and that they repent for their role in these events. The Court hopes that this community makes sure that we never have to find ourselves wondering how something like this could happen to a girl who courageously came forward to protect herself and to hold the defendant accountable at such a vulnerable stage in her life. [Tr. at 40-41; emphasis supplied.]

17

**Argument**

A.    *The Amended Complaint Fully Satisfies the Relevant Pleading Standards*

Daskal and the other appearing defendants have filed their motions principally under Fed. R. Civ. P. 12(b)(6).  The standards applicable to the evaluation of motions under Fed. R. Civ. P. 12(b)(6) are familiar ones, but they merit emphasis at this stage because they underscore the reasons why the Amended Complaint is sufficient.

The Supreme Court's decisions in *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft* v. *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), require that a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  *See also Hardaway* v. *Hartford Public Works Department*, 879 F. 3d 486 (2d Cir. 2018).

The *Ashcroft* decision, in elaborating on *Twombly*, emphasized:

> [A] complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  "Detailed factual allegations" are not required, *Twombly*, 550 U.S., at 555, 127 S. Ct. 1955, but [Fed. R. Civ. P. 8(a)(2)] does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id.*, at 570, 127 S. Ct. 1955.  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Two working principles underline *Twombly*.  First, the tenet that a court must accept a complaint's allegations as true as inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id.*, at 555, 127 S. Ct. 1955.  Second, determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense. *Id.*, at 556, 127 S. Ct. 1955.  A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth....[L]egal conclusions must be supported by factual allegations.  When there are well-pleaded

18

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. [*Iqbal*, 556 U.S. at 663-664, 129 S. Ct. at 1940-1941.]

Moreover, the allegations advanced "upon information and belief" as to the defendants other than Daskal (*see* AC ¶¶11-39) are sufficient to meet the plausibility standard. The defendants other than Daskal himself presumptively have the information linking them to their conduct relating to Daskal, including their receipt of funds from him in an effort to evade liability to Ms Mandel. As the Second Circuit noted in *DiVittorio* v. *Equidyne Extractive Industries, Inc.*, 822 F. 2d 1242, 1248 (2d Cir. 1987), allegations based "upon information and belief" are sustainable where "much of the factual information needed to fill out plaintiff's complaint lies peculiarly within the opposing parties' knowledge…" *See also Barrett* v. *Forest Laboratories, Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014).

B.    *The Core Allegations of the Amended Complaint Extend to the Additional Defendants*

The underlying premise of the arguments articulated by all the defendants is repeatedly reflected in the legal memorandum dated May 24, 2024, submitted by the firm Dechert LLP (the "Dechert Mem.") on behalf of defendants Rabbi Ben Zion Halberstam and Chaim Halberstam (the "Halberstam defendants") – the assertion that they cannot have any liability under 18 U.S.C. §2255 because the statute allegedly "does not create a cause of action for secondary liability.…" *See* the Dechert Mem. at 2. This fundamentally incorrect theme is repeated throughout the Dechert Mem. (*see, e.g.*, the Dechert Mem. at 5 ["§2255 does not create a right of action predicated on secondary liability.…"]) and is incorporated into the legal memoranda of the other defendants.[3] In short, it is linchpin of the totality of all the moving defendants' arguments.

---

[3] The Dechert Mem. is unrestrained in the restatement of this flawed view. For example, the memorandum asserts that "Section 2255 does not provide for a right of action against individuals alleged to be liable as aiders-and-abettors or accessories (or under any other theory of secondary liability).…" (*id.* at 6). This theme is reasserted

Entitled "Civil remedy for personal injuries," 18 U.S.C. §2255 provides in relevant part as follows:

> (a)    *In general.*  Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.  The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

> (b)    *Statute of limitations.*  There shall be no time limit for the filing of a complaint commencing an action under this section.

Count I of the Amended Complaint alleges violations of §2255 by Daskal and the other defendants.  *See* AC at ¶¶92-94.

Remarkably, the decision on which the Halberstam defendants and the other defendants rely is the United States Supreme Court's 1994 decision in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), a litigation grounded on fraud claims under the federal securities laws.  *See* Dechert Mem. at 6.

Ms. Mandel's action, of course, is not brought under the anti-fraud provisions of the federal securities laws.  It is brought under the provisions of 18 U.S.C. §2255 relating to victims of sexual violations who are minors.  The weight of existing decisional law tips decisively *against* the position taken by the Halberstam defendants and all the other defendants who have adopted

---

virtually *in haec verba* by all the other moving defendants as the central basis for their claims that none of the defendants other than Daskal can have any liability under §2255.

precisely the same arguments. Because of its unique focus on the anti-fraud provisions of the federal securities laws, *Central Bank of Denver* has no relevance to this case.

In contrast, of extreme relevance to Ms. Mandel's case is *T.D.P.* v. *Choice Hotels International, Inc.*, ___ F. Supp. 3d ___, 2024 WL 1256053 (S.D. Ohio 2024), a decision rendered as recently as March 25, 2024. In *Choice Hotels*, the Court concisely and clearly rejected defendants' underlying argument:

> Plaintiff seeks to hold Defendant [a hotel] liable under the Child Abuse Victims Rights Act, 18 U.S.C. §2255(a) ("CAVRA")....
>
> Defendant...argues that the plain language of CAVRA [*i.e.*, 18 U.S.C. §2255(a)] requires Defendant itself to have violated [CAVRA].
>
> *   *   *
>
> This Court's analysis begins and ends with the text of the statute....§2255 does not specify against whom a lawsuit may be brought....In light of that silence, the Court is guided by one of the most familiar canons of statutory interpretation: "courts may not add or subtract words from a statute."....By asking this Court to conclude that only perpetrators can be held liable, Defendant "effectively asks this Court to re-write the statute by inserting (after 'may sue') the words 'the offender' or 'the perpetrator.'"....*Congress added similar language in analogous scenarios, and could have done so here, had it intended to limit criminal liability to the criminal perpetrator....The text provides no reason to believe that Congress intended to prohibit plaintiffs from suing beneficiaries of and participants in the many crimes enumerated in §2255....*[*Choice Hotels*, ___ F. Supp. 3d at ___, 2024 WL 1256053 *3 (emphasis supplied).]

Likewise, the Court in *Jane Doe No. 8* v. *Royal Caribbean Cruises Ltd.*, 860 F. Supp. 2d 1337 (S.D. Fla. 2012), made it clear that liability under §2255 was not limited to the perpetrator or offender. As the Court in *Jane Doe No. 8* explained:

> Specifically, [the defendant] argues that, because the predicate criminal offenses punish the criminal offender, the "obvious purpose [of §2255] is to allow the alleged victim to bring a civil suit

21

for damages against [only] the alleged criminal offender."…The Court disagrees. Although the predicate criminal offenses may be designed to punish the criminal offender, §2255 is designed for a different purpose – namely, to compensate the victim. And because the predicate criminal offenses and §2255 are designed for different purposes, it does not follow that there must be symmetry in liability.…

Further supporting this statutory interpretation is the canon of construction that courts may not add or subtract from a statute.…Again, the text of §2255 provides only that minor victims of certain crimes "may sue in any appropriate United States District Court," 18 U.S.C. §2255. [Defendant], however, effectively asks this Court to re-write the statute by inserting (after "may sue") "the offender" of "the perpetrator." Had Congress intended to limit liability in this respect, it could have done so by including such qualifying language in the statute. In fact, Congress has included such qualifying language in other causes of action that are similarly based on a violation of a criminal provision. *See, e.g.*, 18 U.S.C. §1595(a); 50 U.S.C. §1810; *id.* §1828. [860 F. Supp. 2d at 13410.]

Actions under §2255 have not been limited to the perpetrators only. In *Elden* v. *Nirvana, LLC*, 88 F. 4th 1292 (9th Cir. 2023), the plaintiff, Spencer Elden ("Elden"), invoking §2255, asserted that "he was the victim of a child pornography offense when (as a four-month-old baby) he was photographed naked in a pool for the cover of Nirvana's iconic album *Nevermind*." 88 F. 4th 1292 at 1293.

Named as defendants in *Elden* were, among others, Nirvana (the music group), the producers and distributors of the album and the members of the group, not just the person who took the photograph of the nude four-month-old. None of the defendants in *Elden* asserted that only perpetrators could be held liable under §2255.

Relying on the fact that the album cover was first released in 1991 and the plaintiff initiated the litigation in 2021, the defendants unsuccessfully moved for dismissal under Fed. R. Civ. P. 12(b)(6) on the ground that the action was barred by the Statute of Limitations, not on the ground that only the direct offender could have liability.

C.    *"Aiding and Abetting" Standards Extend Liability to the Additional Defendants*

In a revealing oversight, defendants found it convenient to ignore the provisions of 18 U.S.C. §2 which imposes liability on aiders and abettors and secondary actors involved in criminal activity.

Specifically, §2 of 18 U.S.C. provides as follows:

> (a)    Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b)    Whoever willfully causes an action to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Even the majority opinion in *Central Bank of Denver* conceded the "ancient" significance of aiding and abetting liability:

> Aiding and abetting liability is an ancient criminal law doctrine. See *United States* v. *Peoni*, 100 F. 2d 401, 402 (2d. Cir. 1938); 1 M. Hale, Pleas of the Crown 615 (1736). Though there is no federal common law of crimes, Congress in 1909 enacted what is now 18 U.S.C. §2, a general aiding and abetting statute applicable to all federal criminal offenses. Act of Mar. 4, 1909, §332, 35 Stat. 1152. The statute decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime. *Nye & Nissen* v. *United States*, 336 U.S. 613, 619, 69 S. Ct. 766, 769-770, 93 L. Ed. 919 (1949). [*Central Bank of Denver*, 511 U.S. at 181.]

The decision in *Central Bank of Denver* also acknowledged that the applicability of aiding and abetting liability extends to *civil* as well as criminal cases. "The Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting. *An actor is liable for harm resulting to a third person from the tortious conduct of another 'if he…knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other.…'* Restatement (Second) of Torts §876(b) (1977).…" *Central Bank of Denver*, 511 U.S. at 181; emphasis supplied.

23

D.    *The Amended Complaint Does Not Require a "More Definite Statement"*

To the extent that defendants contend that Ms. Mandel's complaint should contain a more definite statement, that branch of the motions should be denied.  The AC contains detailed factual statements drawn from public documents, such as the state and federal indictments, letters from the Office of the United States Attorney, transcripts from the federal proceedings before Judge Garaufis, and statements made by a person – Ms. Mandel – who has first-hand knowledge and information.

E.    *The Court Should Retain Supplemental Jurisdiction over the State Law Counts*

The state law claims of Count II, Count III, Count IV, Count V and Count VI are direct, straightforward and complete.  They allege rape (Count II), sexual abuse (Count III), assault (Count IV), battery (Count V) and intentional infliction of emotional distress (Count VI).

Any argument of defendants that Counts I through VI should be dismissed ignores the provisions of 28 U.S.C. §1367 relating to supplemental jurisdiction.  §1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

## Conclusion

For the foregoing reasons, plaintiff Rivka Mandel respectfully requests that the Court deny defendants' motions.

Dated: New York, New York
       September 27, 2024

PAUL BATISTA, P.C.

By: _____
    Paul Batista
    Attorney for Plaintiff
    RIVKA MANDEL
26 Broadway, Suite 1900
New York, New York 10004
(631) 377-0111
Batista007@aol.com

25