# Exhibit A

# EXHIBIT 2

# SECOND AMENDED COMPLAINT TRACK CHANGES

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------x

RIVKA MANDEL,

Plaintiff,

- against -

JACOB DASKAL; BORO PARK SHOMRIM; CONGREGATION SHAAREI ZION OF BOBOV; RABBI BEN ZION HALBERSTAM; LIPA "NUSSY" BRAUNER; BELLA DASKAL; PEARL DEMBITZER; LEIBY DEMBITZER; CHAYA BORNSTEIN; SHULEM BORNSTEIN; CHAIM DASKAL; ESTHER BRODY; ROSE TEITELBAUM; BENZION DASKAL; SOLOMON DASKAL; BARRY DASKAL; ~~CHAVI FISCHBEIN; ISAAC FISCHBEIN; BAIS YAAKOV HIGH SCHOOL OF CHICAGO; CRAINDELL Z. MANNES; ; CHAIM S. HALBERSTAM~~;~~; RABBINICAL COLLEGE BOBOVER YESHIVA BNEI ZION;; MUTTY BRAUNER~~;~~ YAO EPHRAIM a/k/a EZRAS CHOLIM YAD EPHRAIM; PESACH GREENBERG; YACHAD D'BOBOV; and CHAIM FLEISCHER~~; and TRANSFEREE DOES 1-20~~,~~

Defendants.

-------------------------------------x

1:23-cv-07352 (RER) (VMS)

**JURY TRIAL DEMANDED**

**SECOND AMENDED COMPLAINT**

## SECOND AMENDED COMPLAINT

Plaintiff Rivka Mandel, by and through her attorneys, Cohen and Green PLLC and Massimi Law PLLC~~Paul Batista, P.C.~~, for her Second Amended Complaint against defendant Jacob Daskal and the other defendants identified in this Second Amended Complaint respectfully alleges as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to 18 U.S.C. §2255; New York State tort laws; New York City Gender-Motivated Violence Act (NYC Admin. Code §10-1104.1); Uniform Voidable Transactions Act ("UVTA"); and Uniform Fraudulent Conveyance Act ("UFCA").

**Preliminary Statement**

~~1.~~2. This action involves heinous sexual, emotional and physical abuse of a minor woman by Jacob Daskal ("Daskal"), a convicted felon who, at the age of 65, was sentenced on October 11, 2023, in this Court (Hon. Nicholas Garaufis, *U.S.D.J.)* to 17.5 years in federal prison as a result of his guilty plea and conviction on a federal indictment resulting from Daskal's reprehensible crimes against plaintiff Rivka Mandel.

~~2.~~3. As this Complaint will articulate in detail, Ms. Mandel, beginning when she was 15 years old, was consistently, viciously and remorselessly raped, sodomized, sexually harassed, and criminally intimidated and threatened by Daskal, who for decades has proclaimed himself to be a highly prominent member of a religious and social community in a position of alleged trust, honor and reverence in that community. His criminally despicable acts against a child took place in a stunning variety of places - in his own homes with his wife, children and others present yet voicing no objection, attempting no intervention, and communicating no concerns to law enforcement or other Governmental authority, in various locations in New York, as well as in other states to which Daskal transported Ms. Mandel with the assistance, cooperation and aiding and abetting of other defendants.

~~3.~~4. The wanton devastation of Ms. Mandel, who is now 24~~2~~, is a case of repeated rape, sodomy, physical, mental and emotional abuse of a child.

~~4.~~5. Moreover, Daskal's crimes were aided and abetted, facilitated, and concealed by the other defendants identified in this Second Amended Complaint, as Judge Garaufis

specifically and eloquently described at the October 11, 2023, sentencing of Daskal. As Judge Garaufis explained, the other named defendants and others whose identities will be revealed through the use of federal disclosure procedures provided collective communal assistance to

Daskal by defendants' criminal acts (i) to deter Ms. Mandel from seeking vindication for the crimes she suffered and to silence her through attempts of bribery and threats and acts of violence against her, and (ii) corruptly to deter her from providing information as to Daskal's pattern, practice, and history of sexual assault and abuse of many other young women to whom defendants and other community members provided access to him to groom those children in order to achieve Daskal's sexual abuse and exploitation of them.

~~5.~~6. Daskal's crimes are not a matter of conjecture or speculation. Instead, his crimes are conclusively determined. In connection with a highly publicized and serious federal indictment of him, he pleaded guilty on July 14, 2023, to grave offenses against Ms. Mandel before Judge Garaufis. During the July 14, 2023 guilty plea, Daskal provided some, but by no means complete, admissions of his repeated criminal activity against Ms. Mandel. Daskal corruptly provided no information as to the identities and criminal conduct of others who facilitated his crimes and to whom he transferred millions of dollars of his assets in an effort to avoid compensation to Ms. Mandel.

~~6.~~7. In addition, at his October 11, 2023, sentencing, defendant Daskal under oath made definitive admissions of the criminal acts he committed against Ms. Mandel and unequivocally conceded that he had severely harmed Ms. Mandel economically and emotionally. Collectively, Daskal's sworn statements, although not complete or fully candid, conclusively establish his liability to her for the civil and criminal violations alleged in this Second Amended Complaint and for the enormous financial damage he has inflicted on her for which this civil action demands full recovery from him, the other defendants and others, as well as the punitive damages to which express federal legislation entitles her.

~~7.~~8. Moreover, as to the other defendants and others whose identities will be revealed through federal disclosure laws, Judge Garaufis at the October 11, 2023, sentencing made clear that the other defendants identified in this Second Amended Complaint and others bear responsibility for creating and maintaining a regime of terror and intimidation which is wholly consistent with the operation of gangland enterprises that generate fear, a code of *omerta,* and a system of revenge and intimidation identical in many respects to the operation of drug cartels, organized crime syndicates, and terrorist organizations.

~~8.~~9. Extraordinary financial compensation to Ms. Mandel is essential. The interests of justice and human decency require that Daskal, an immensely wealthy man who has admittedly, although incompletely and deceptively, conceded the transfer of millions of assets he owns or controls to friends, family members, putative charities, religious institutions, business associates, shell companies, "straw" owners, the other defendants identified in this Second Amended Complaint, and others whose identities will be revealed through discovery and non-party disclosure provisions of federal law, be compelled to compensate Ms. Mandel by the entry of substantial financial judgments against him, the other named defendants, and others, and the transfer from Daskal, the other named defendants, and others whose identities will be revealed through federal disclosure procedures of Daskal's secreted assets to Ms. Mandel.

**The Parties**

~~9.~~10. Ms. Mandel is a citizen and resident of the State of New York. The Defendants have been aware of Ms. Mandel's status as a creditor since at least August 2017.

I0. Defendant Daskal is a citizen of the United States and resident of the City of New York at 1220 46th Street, Brooklyn, New York 11219. Daskal is now in the custody of the United States Bureau of Prisons bearing Register Number 32907-508.

11. Defendant Boro Park Shomrim a/k/a Boro Park Shomrim Patrol ("Boro Park Shomrim") is an organization located at 3618 14th Avenue, Brooklyn, New York 11218. Defendant

Daskal was an organizer, founder, leader and controlling person of Boro Park Shomrim. Defendant Boro Park Shomrim had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to Boro Park Shomrim for the purpose of avoiding compensation to Ms. Mandel.

~~11.~~12. Moreover, defendant Boro Park Shomrim remains, as set forth upon information and belief, a target, subject or entity of interest in a continuing criminal investigation by the United States Department of Justice into the trafficking in and sexual exploitation of more than a dozen women in addition to Ms. Mandel who were sexually abused by defendant Daskal.

~~12.~~13. Defendant Congregation Shaarei Zion of Bobov ("Shaarei Zion") is located at 4803 15th Avenue, Brooklyn, New York 11219. Defendant Rabbi Halberstam is the Head of defendant Shaarei Zion. Defendant Shaarei Zion had knowledge of, facilitated, aided and abetted, and concealed the criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal for the purpose of avoiding compensation to Ms. Mandel.

~~11.~~14. Like defendant Boro Park Shomrim, defendant Shaarei Zion is, upon information and belief, the target of, subject of, or entity of interest in a continuing criminal investigation by the United States Department of Justice into the trafficking in and sexual

exploitation of more than a dozen women in addition to Ms. Mandel who were sexually abused by defendant Daskal.

15. Defendants Boro Park Shomrim and Shaarei Zion are collectively referred to herein as the "Institutional Enabler Defendants."

~~12.~~ 15.

Rabbi Ben Zion Halberstam ("Rabbi Halberstam") is a United States citizen residing at 4803 15th Avenue, Brooklyn, New York 11219. As alleged upon information and belief, defendant Rabbi Halberstam had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of assets of defendant Daskal transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Halberstam was at all relevant times the Grand Rabbi of Congregation Shaarei Zion of Bobov of which Defendant Daskal was a member and Plaintiff attended. Defendant Halberstam knew of Daskal's abuse of Plaintiff and had a duty to intervene on Plaintiff's behalf and failed to do so.

15. Defendant Lipa "Nussy" Brauner ("L. Brauner") resides at 284 Wallabout Street, Brooklyn, New York 11206. As alleged upon information and belief, defendant L. Brauner had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets from defendant Daskal to avoid compensation to Ms. Mandel. Defendant L. Brauner is believed to be Transferee Doe 16 for purposes of the UVTA claims alleged herein. Defendant L. Brauner was at all times the business partner of Defendant Daskal and repeatedly intervened after Defendant was indicted in an effort to get Plaintiff to withdraw her criminal allegations against Daskal. Defendant L. Brauner did this by asking people with perceived power within the Ultraorthodox Hasidic Community to pressure Plaintiff to drop the allegations.

16. Indeed, as alleged upon information and belief, defendant L. Brauner was, among other things, one

of the principal architects and organizers of efforts (i) to conceal defendant Daskal's criminal activities, (ii) to attempt to intimidate Ms. Mandel into silence regarding Daskal's criminal activity, (iii) to seek to bribe her into silence, and (iv) to obstruct justice by assaults on her property and threats to her safety in an effort to secure her silence and withdrawal of cooperation from prosecuting authorities.

17. ~~D~~efendant Bella Daskal ("B. Daskal") is a United States citizen and resident of the City of New York at 1220 46th Street, Brooklyn, New York 11219. Defendant B. Daskal is the wife of defendant Daskal and, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets transferred to her for the purpose of avoiding compensation to Ms. Mandel.

~~13.~~18. Defendants Rabbi Halberstam, L. Brauner, and Bella Daskal are referred to collectively herein as the "Individual Enabler Defendants."

19. Defendant Bella Daskal is also believed to be Transferee Doe 1 for purposes of the UVTA claims alleged herein in that she was the recipient of substantial assets transferred to her for the purpose of avoiding compensation to Ms. Mandel.

~~14.~~20. Defendant Pearl Dembitzer ("P. Dembitzer") is a citizen of the United States and resident of the City of New York at 1426 46th Street, Brooklyn, New York 11219. She is a daughter of defendant Daskal and, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to her for the purpose of avoiding compensation to Ms. Mandel. Defendant Pearl Dembitzer is believed to be Transferee Doe 2 for purposes of the UVTA claims alleged herein. Defendant Pearl Dembitzer was often present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~15.~~21. Defendant Leiby Dembitzer ("L. Dembitzer") is a United States citizen and a resident of the City of New York at 1426 46th Street, Brooklyn, New York 11219. L. Dembitzer is the son-in-law of defendant Daskal and married to defendant P. Dembitzer. Upon information and belief, L. Dembitzer had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Lieby

Dembitzer is believed to be Transferee Doe 3 for purposes of the UVTA claims alleged herein. Defendant Lieby Dembitzer was often present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~16.~~22. Defendant Chaya Bornstein ("C. Bornstein") is a United States citizen residing at 314 Foster Avenue, Brooklyn, New York 11230. C. Bornstein is the daughter of defendant Daskal and, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient

of substantial assets of defendant Daskal transferred to her for the purpose of avoiding compensation to Ms. Mandel. Defendant Chaya Bornstein is believed to be Transferee Doe 4 for purposes of the UVTA claims alleged herein. Defendant Chaya Bornstein was often present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~17.~~23. Defendant Shulem Bornstein ("S. Bornstein") is a United States citizen and a resident of the City of New York at 314 Foster Avenue, Brooklyn, New York 11230. Defendant S. Bornstein is the son-in-law of defendant Daskal and the husband of C. Bornstein. Defendant S. Bornstein, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Shulim Bornstein is believed to be Transferee Doe 5 for purposes of the UVTA claims alleged herein. Defendant Shulem Bornstein was often present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~18.~~24. Defendant Chaim Daskal ("C. Daskal") is a United States citizen and resident of the City of New York at 1680 47th Street, Brooklyn, New York 11204. Defendant C. Daskal is the son of defendant Daskal and, upon information and belief, had knowledge of facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Chaim Daskal is believed to be Transferee Doe 6 for purposes of the UVTA claims alleged herein.

~~19.~~25. Defendant Esther Brody ("E. Brody") is a United States citizen residing at 4701 12th Avenue, Apartment A-4, Brooklyn, New York 11219. Defendant E. Brody is the daughter of defendant Daskal and, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to her for the purpose of avoiding compensation to Ms.

Mandel. Defendant Esther Brody is believed to be Transferee Doe 7 for purposes of the UVTA claims alleged herein. Defendant Esther Brody was present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~20.~~26. Defendant Rose Teitelbaum ("R. Teitelbaum") is a United States citizen and a resident of the City of New York at 1225 48th Street, Brooklyn, New York 11204. Defendant

R. Teitelbaum is a daughter of defendant Daskal and, as described later upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets of defendant Daskal transferred to her for the purpose of avoiding compensation to Ms. Mandel. Defendant Rose Teitelbaum is believed to be Transferee Doe 7 for purposes of the UVTA claims alleged herein. Defendant Rise Teitelbaum was present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~21.~~27. Defendant Benzion Daskal is a United States citizen and a resident of the City of New York at 5427 19th Avenue, Brooklyn, New York 11204. Defendant Benzion Daskal is the son of defendant Daskal and, upon information and belief, had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Benzion Daskal is believed to be Transferee Doe 8 for purposes of the UVTA claims alleged herein. Defendant Benzion Daskal was present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~22.~~28. Defendant Solomon Daskal ("S. Daskal") is a United States citizen residing at 2202 Dewitt Terrace, Linden, New Jersey 07036. He is the son of defendant Daskal. As alleged upon information and belief, S. Daskal had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of substantial assets transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Solomon Daskal is believed to be Transferee Doe 9 for purposes of the UVTA claims alleged herein. Defendant Solomon Daskal was present at Daskal's home in South Fallsburg at time when he was assaulting Plaintiff.

~~23.~~29. Defendant Barry Daskal is a United States citizen residing at 450 Westminster Road, Brooklyn, New York 11218. Barry Daskal is the brother of defendant Daskal. As alleged upon information and belief, Barry Daskal had knowledge of, facilitated, aided and abetted, and concealed the

extensive criminal conduct of defendant Daskal and was the recipient of substantial assets transferred to him for the purpose of avoiding compensation to Ms. Mandel. Defendant Barry Daskal is believed to be Transferee Doe 10 for purposes of the UVTA claims alleged herein.

~~24.~~30. Defendant Boro Park Shomrim is believed to be Transferee Doe 11 for purposes of the UVTA claims alleged herein.

~~25. Defendant Bais Yaakov High School of Chicago ("Bais Yaakov") is a putative school located at 5800 North Kimball Avenue, Chicago, Illinois 60659. As alleged upon information and belief, defendant Bais Yaakov had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of assets of defendant Daskal transferred to Bais Yaakov for the purpose of avoiding defendant Daskal's obligation to pay compensation to Ms. Mandel.~~

26. Defendant Craindell Z. Mannes ("Mannes") is a United States citizen residing at 6027 North Central Park Avenue, Chicago, Illinois 60659. As alleged upon information and belief, Mannes had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct inflicted by defendant Daskal on Ms. Mandel.

11.31. Defendant Rabbi Halberstam is believed to be Transferee Doe 12 for purposes of the UVTA claims alleged herein.

12.32. Defendant Shaarei Zion is believed to be Transferee Doe 13 for purposes of the UVTA claims alleged herein.

33. . Defendant L. Brauner is believed to be Transferee Doe 14 for purposes of the UVTA claims alleged herein.

34. Bella Daskal, P. Dembitzer, L. Dembitzer, C. Bornstein, S. Bornstein, C. Daskal, E. Brody, R. Teitelbaum, Benzion Daskal, S. Daskal, Barry Daskal, Boro Park Shomrim, Halberstam, Shaarei Zion, and L. Brauner are collectively referred to herein as the "Transferee Defendants."

27.

~~13. Defendant Yad Ephraim a/k/a Ezras Cholim Yad Ephraim ("Yad Ephraim") is located at 5017 10th Avenue, Brooklyn, New York 11219, and 1274 49th Street, Brooklyn, New York 11219. As alleged upon information and belief, defendant Yad Ephraim had knowledge of, facilitated, aided and abetted, and concealed the extensive criminal conduct of defendant Daskal and was the recipient of assets transferred to it for the purpose of avoiding compensation to Ms. Mandel.~~

~~14. Defendant Pesach Greenberg is a United States citizen residing at 5017 10th Avenue, Brooklyn, New York 11219. He is the founder of defendant Yad Ephraim.~~

~~15. Defendant Yachad D'Bobov is located at 5014 16th Avenue, #296, Brooklyn, New York 11204. As alleged upon information and belief, defendant Yachad D'Bobov had knowledge of, facilitated, aided and abetted, and concealed defendant Daskal's extensive criminal conduct.~~

35. ~~Defendant Chaim Fleischer ("Fleischer") resides at 5014 16th Avenue, #296, Brooklyn, New York 11204. Defendant Fleischer is the Executive Director of defendant Yachad D'Bobov. Upon information and belief, defendant Fleischer had knowledge of, facilitated and concealed the extensive criminal conduct of defendant Daskal.~~

~~16.~~36. Defendant Transferee Does 1-20 are individuals whose true names are currently unknown to the Plaintiff except as otherwise described herein, and who are believed to have received compensation from Defendant Daskal for purposes of avoiding compensation to Ms. Mandel.

**Jurisdiction and Venue**

~~17.~~37. This Court has federal question jurisdiction pursuant to 18 U.S.C. §2255, 18 U.S.C. §1595, 28 U.S.C. §1331 and 28 U.S.C. §1367.

~~18.~~38. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the state law claims due to the common nucleus of operative facts with the federal claims.

~~19.~~39. Venue is proper in this District pursuant to 28 U.S.C. §1391 and 18 U.S.C. §2255(c).

**Statement of Facts Common to All Counts**

*A. Overview: Defendant Daskal 's Criminal Conduct and Accomplice Conduct of the Defendants*

40. On July 14, 2023, the United States Attorney for the Eastern District of New York published a press release stating:

As set forth in court filings, the defendant [Daskal] was the head of the Boro Park Shomrim Society (the "Shomrim"), a private, Orthodox Jewish crime-patrol group associated with the New York City Police Department. In the spring of 2017, as a result of his position with the Shomrim, the defendant was connected to a 15-year-old-girl, whom he took into his home and groomed for sex.

41. With the full knowledge, consent, and assistance of Defendant Shomrim, Defendant Daskal held himself out in his community as someone who could help young women and girls. Indeed, this is exactly how Shomrim facilitated Ms. Mandel's contact with Shomrim: by physically bringing her to Mr. Daskal under the false representation that he would help her when in fact Shomrim and others knew Mr. Daskal was a rapist and abuser and would do the same to Ms. Mandel.

~~20.~~42. In an article dated July 16, 2023, the Associated Press and the *Times of Israel* published an article entitled *Ex-Leader of Shomrim Patrol in Brooklyn Pleads Guilty to Sexual Abuse of Teen Girl* (https://www.timesofisraeJ.com/ex-leader-of-shomrim-patrol-in-brooklyn-pleads-guilty-to-sexual-abuse-of-teen-girl/:

> The former leader of a U.S. safety patrol in Brooklyn's ultra-Orthodox Jewish community pleaded guilty on Friday *[i.e.,* July 14, 2023] to charges he sexually abused a teenage girl.
>
> Jacob Daskal, who founded the Shomrim group of Borough Park some 30 years ago, was charged in March 2021 with coercing a minor to engage in illicit sexual conduct, transportation of a minor with intent to engage in illicit sexual activity and traveling with intent to engage in illicit sexual conduct, according to the U.S. Attorney's Office for the Eastern District of New York.
>
> The [guilty] plea allows Daskal to avoid a trial in a case that alleged he groomed a 15-year-old girl for sex. Authorities said Daskal subjected the girl to sexual acts over a three-month period in

2017. He was arrested in 2018 on state level charges....

According to the original indictment against him, Daskal assaulted the victim in his Brooklyn home as well as at his summer home in South Fallsburg, New York in August 2017. Two months later, the victim *[i.e.,* Ms. Mandel] moved to Chicago to attend a new school and live with another family. While she was there, Daskal contacted the victim - also from a Haredi community - and coerced her into video chatting naked and sending him nude photos. In November of that year, Daskal traveled to Chicago to visit the victim, bringing her to his hotel room and raping her.

*"Daskal, who was almost 60 years old when these crimes were committed, exploited the vulnerability of a young teenager by grooming her for sex and enticing her into having sexual relations with him,"* said Seth DuCharme, the acting US [A]ttorney for the [E]astern [D]istrict of New York....

*"The defendant had admitted he abused his power, trust and position in the community by committing deplorable acts against a child in his care,"* said US Attorney Breon Peace.

> Daskal faces a minimum prison sentence of 14 years.
>
> Daskal headed the Boro Park Shomrim Society, an Orthodox Jewish crime-patrol group associated with the New York Police Department.
>
> The organization... patrols Borough Park in marked cars, and is considered a powerful force in the neighborhood. [https://www.timesofisrael.com/ex-leader-of-shomrim-patrol-in-brooklyn-pleads-guilty-to-sexual-abuse-of-teen-girl/ (emphasis supplied).]

43. Defendant Bella Daskal allowed Mr. Daskal to abuse and rape Ms. Mandel within their homes.

44. There is no question that Bella Daskal knew of Ms. Mandel's abuse. Yet, she enabled Mr. Daskal by allowing ongoing access to Ms. Mandel under the cover of domestic normalcy.

45. Bella Daskal participated in the abuse by fabricating a stepchild narrative regarding Ms. Mandel that created access and cover for Mr. Daskal.

46. Bella Daskal concealed Mr. Daskal's abuse of Ms. Mandel by transferring her to suppress and hide the abuse rather than protecting the victim.

47. In this same way, Defendant Daskal's children and their spouses harbored Ms. Mandel at their South Fallsburg, NY home, allowing Mr. Daskal to access Ms. Mandel whenever he wanted to, in furtherance or raping and abusing Ms. Mandel.

48. In addition to all of the above allegations demonstrating Defendant Daskal's animus against women, Defendant Daskal also used his power and authority to systemically sexually abuse women and girls in addition to Plaintiff.

49. Defendant Daskal repeatedly demeaned and humiliated women within his community and even his own family.

50. It was known within the community that Defendant Daskal had many victims whom he often

referred to as "my Rivkalas." Many, if not all, of these were underaged girls who were delivered to him by Shomrim under the guise of helping them.

51. Defendant Daskal often mocked the fact that his wife did not know how to drive when they got married and, at least at that time, was not allowed to drive, despite her desire to do so.

52. Defendant Daskal often stated that he would allow his wife to drive if she took a sex class to learn how to please him sexually.

53. Defendant Daskal made it known that he wanted his wife to do things sexually that she did not want to do.

54. In order to coerce his wife into sex acts, Defendant Daskal dangled the promise of possibly permitting her to drive.

55. Defendant Daskal would further disrespect his wife by Skyping Ms. Mandel and exposing himself to her while Daskal's wife slept in the bed next to him.

56. Defendant Daskal used his position within Shomrim to demean and humiliate women in his community.

57. For instance, at one point, Shomrim was receiving calls from women in the community who were claiming that a religious man was stopping them on the street, asking to use their cell phones, calling his cell phone from their phones, and then using their phone numbers to harass them.

58. After receiving numerous complaints, Defendant Daskal, as a member of Shomrim, went to a synagogue to see the man and realized he knew him.

59. After Daskal realized he knew the man who was harassing women in his community, he began disparaging the women, saying they were "fat and ugly" and therefore he would not arrest the

harasser.

60. These are just some examples of the methods Defendant Daskal used to instill fear in women, humiliate and demean them.

61. As described above, Shomrim facilitated Defendant Daskal's access to and abuse of Ms. Mandel, despite Shomrim's obligation to protect Ms. Mandel.

62. Shomrim holds itself out as the protector of its community. Yet, it has long been reported that Shomrim does not report crimes to the NYPD in a timely fashion or at all. https://web.archive.org/web/20110923160509/http://www.villagevoice.com/2011-09-07/news/gotham-s-crusaders-shomrim-jewish-neighborhood-patrol/ (former Borough Park resident speaking about Shomrim and stating "Borough Park is a very safe neighborhood for adults. Its just not very safe for kids.").

63. Moreover, it has long been reported that leaders of the "Bobov Hasidic dynasty" work with Shomrim to bury abuse of children in their community. *Id.*

64. Even going back to the murder of Lieby Kletzky, Defendant Daskal was interviewed about Defendant Shomrim's decision not to call the police when Kletzkey went missing stating "It wouldn't have mattered. And the police wouldn't have come right away."

65. One Orthodox victims' rights advocate has noted the manner in which religious leaders and Shomrim work together to cover up abuse:

> "The Shomrim have helped the police maintain a community that's mostly free of the shootings in the streets and crimes that usually end up in the media," says Ben Hirsch, a founder of the advocacy group Survivors for Justice. "But you do still have some of the terrible social crimes that police would normally be responding to. Instead, within these communities, these crimes are usually reported to Shomrim, and the Shomrim coordinators working together with Orthodox Jewish "community liaisons" cover it up, and it never gets to the cops."
> Hirsch, an Orthodox Jew from Flatbush, founded Survivors for Justice in 2006 to help Haredi victims of sexual abuse.

"The problem is that for a very long time, the rabbinic leadership has refused to acknowledge the problem. You protect the offenders long enough, and over time you're going to create a safe environment for deviants."

*Id.*

66. Such is the case of what happened here. Defendant Rabbi Ben Zion Halberstam, the grand rabbi of Shaarei Zion of Bobov – attended by Defendant Jacob Daskal, Bella Daskal, and Plaintiff – knew of Defendant Daskal's abuse of Plaintiff and failed to report it.

67. Even after Defendant Daskal was convicted of sexual abuse of Ms. Mandel, Defendant Halberstam continued to cover for Mr. Daskal, writing to the Court and asking for leniency for Defendant Daskal, and describing his "outreach" as "exceptional."

68. Defendant L. Brauner attempted to bribe members of the community into pressuring Ms. Mandel to withdraw her allegations against Mr. Daskal.

69. Upon information and belief, Defendant Brauner was the principal architect of the campaign to bribe and intimidate Ms. Mandel, including the physical destruction of her property (slashing her tires).

70. Defendant Brauner's conduct constitutes affirmative "concealment" under the GMVA: direct witness tampering and intimidation designed to prevent disclosure of gender-motivated violence.

*B. The Findings of United States District Judge Garaufis*

~~21.~~ 71. The publicity surrounding Daskal's criminal conduct does not fully capture the background, the scope and the heinous nature of his conduct and the devastation of Ms. Mandel's life. In a highly detailed 54-page Memorandum and Order filed on June 9, 2023, Judge Garaufis stressed the broader factual context:

- From approximately August 2017 through November 2017,

Daskal initiated and pursued a pervasive campaign of sexual abuse of Ms. Mandel.

- Among other things, as Judge Garaufis determined, "Daskal is the founder and chief of the Boro Park Shomrim Society, a private, Orthodox Jewish crime-patrol group."

- Judge Garaufis further determined that Daskal, in or about June 2017, "offered to have [Ms. Mandel] stay with his family at his summer home in South Fallsburg, New York... [and Ms. Mandel] moved in shortly thereafter."

- In "August 2017... Daskal began to sexually abuse [Ms. Mandel]" and the "abuse continued... over the summer…"

- Daskal also consistently coerced Ms. Mandel, who was 15, into silence. As Judge Garaufis emphasized, "Daskal also told [Ms. Mandel] that 'no one should see what we do' and that she should not tell anyone about the abuse because 'it's just going to ruin your life.' Daskal and [Ms. Mandel] later returned to Brooklyn where he continued to engage in sexual activity with [Ms. Mandel] and sent her text messages describing his sexual fantasies."

- As Judge Garaufis also noted, Daskal's illegal conduct was not confined to locations in New York only. More specifically, in October 2017, Ms. Mandel, "with the assistance of Daskal," enrolled in a high school in Chicago, Illinois.

- While Ms. Mandel was in Chicago, Daskal and she "shared sexually explicit text messages and Skype video chats while apart."

- Daskal's activities were not limited to text messages and Skype video chats. In November 2017 Daskal also "traveled" to meet Ms. Mandel in Chicago, "when they again engaged in sexual activity."

- When Ms. Mandel disclosed Daskal's conduct to a classmate at the school in Chicago, Ms. Mandel was "expelled" from the school and "sent back to Brooklyn."

- When Ms. Mandel was "sent to live in Israel, Daskal continued to communicate with [Ms. Mandel] over social media."

- In yet another aspect of his reprehensible conduct, Daskal demanded that Ms. Mandel "write a letter stating that they engaged in sex as part of 'therapy' and that she loved him, hoping that this letter would exonerate him if his abuse was discovered."

- In yet another brazen effort at exploitation and intimidation, "Daskal also repeatedly told [Ms. Mandel] about his connections to police, stature in the Jewish community, and that he would deny any allegations that she made against him."

*C. The State Indictment of Daskal*

~~22.~~72. Defendant Daskal was originally indicted on May 11, 2018, in the Supreme Court of the State of New York, Kings County (the "State Indictment").

~~23.~~73. The State Indictment discloses in vivid detail by reference to dates, conduct and locations certain aspects of Daskal's criminal activity against Ms. Mandel as identified by the Grand Jury. More specifically, the State Indictment [Indictment No. 3569-2018] discloses the following:

*(i)* *First Count*

- Daskal committed the crime of "Rape in the Third Degree [PL 130.25(2)) ... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017, in the County of Kings, being twenty-one years old or more, engaged in sexual intercourse with an individual known to the Grand Jury [Ms. Mandel], a person less than seventeen years old."

*(ii)* *Second Count*

- Daskal committed the crime of "Criminal Sexual Act in the Third Degree [PL 130.40(2)). . . as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017, in the County of Kings, being twenty-one years old or more, engaged in oral sexual conduct, namely: contact between the penis of the defendant and the mouth of an individual known to the Grand Jury [Ms. Mandel], a person less than seventeen years old."

*(iii)* *Third Count*

- Daskal committed the crime of "Criminal Sexual Act in the Third Degree [PL 130.40(2)]... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017, in the County of Kings, being twenty-one years old or more, engaged in oral sexual conduct, namely: contact between the mouth of the defendant and the vagina of an individual known to the Grand Jury [Ms. Mandel], a person less than seventeen years old."

*(iv)* *Fourth Count*

- Daskal committed the crime of "Sexual Misconduct [PL 130.20(1)]... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017, in the County of Kings, engaged in sexual intercourse with [Ms. Mandel], an individual known to the Grand Jury, without such person's consent."

*(v) Fifth Count*

- Daskal committed the crime of "Sexual Misconduct [PL 130.20(2}]... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017, in the County of Kings, engaged in oral sexual conduct with another person [Ms. Mandel], namely: contact between the penis of the defendant and the mouth of [Ms. Mandel] . . ."

*{vi) Sixth Count*

- Daskal committed the crime of "Sexual Misconduct with [Ms. Mandel], namely: contact between the penis of the defendant and the mouth of [Ms. Mandel] . . ."

*(vii) Seventh Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55]... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's penis to the vagina of [Ms. Mandel]. .."

*(viii) Eighth Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55]... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's penis to the mouth of [Ms. Mandel].. ."

*(ix) Ninth Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55)... as follows: The Defendant Jacob Daskal, on or about and between August 6, 2017 and August 27, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's mouth to the vagina of [Ms. Mandel]… "

*(x)* *Tenth Count*

- Daskal committed the crime of "Rape in the Third Degree [PL 130.25(2)]... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in sexual intercourse with [Ms. Mandel]…"

*(xi)* *Eleventh Count*

- Daskal committed the crime of "Criminal Sexual Act in the Third Degree [PL 130.40(2)] as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in oral sexual conduct, namely: contact between the penis of the defendant and the mouth of [Ms. Mandel]…"

*(xii)* *Twelfth Count*

- Daskal committed the crime of "Criminal Sexual Act in the Third Degree [PL 130.40(2)]. as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in oral sexual conduct, namely: contact between the mouth of the defendant and the vagina of [Ms. Mandel]…."

*(xiii)* *Thirteenth Count*

- Daskal committed the crime of "Sexual Misconduct [PL 130.20(1)]... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in sexual intercourse with [Ms. Mandel]…"

*(xiv)* *Fourteenth Count*

- Daskal committed the crime of "Sexual Misconduct [PL 130.20(2)]... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in oral sexual conduct with [Ms. Mandel], namely: contact between the penis of the defendant and the mouth of [Ms. Mandel]…"

*(xv) Fifteenth Count*

- Daskal committed the crime of "Sexual Misconduct [PL 130.20(2)]... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017... engaged in oral sexual conduct with [Ms. Mandel], namely: contact between the mouth of the defendant and the vagina of [Ms. Mandel]… "

*(xvi) Sixteenth Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55)... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's penis to the vagina of [Ms. Mandel]…"

*(xvii) Seventeenth Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55)... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's penis to the mouth of [Ms. Mandel]…"

*(xviii) Eighteenth Count*

- Daskal committed the crime of "Sexual Abuse in the Third Degree [PL 130.55)... as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017 subjected [Ms. Mandel] to sexual contact by touching the defendant's mouth to the vagina of [Ms. Mandel]…"

*(xix) Nineteenth Count*

- Daskal committed the crime of "Endangering the Welfare of a Child [PL 260.10(1)] as follows: The Defendant Jacob Daskal, on or about and between August 9, 2017 and August 30, 2017 knowingly acted in a manner likely to be injurious to the physical, mental or moral welfare of [Ms. Mandel], a child less than seventeen years old."

*(xx) Twentieth Count*

- Daskal committed the crime of "Endangering the Welfare of a Child [PL 260.10(1))... as follows: The Defendant Jacob Daskal, on or about and between September l, 2017 and October 19, 2017... knowingly acted in a manner likely to be injurious to the physical, mental or moral welfare of [Ms. Mandel], a child less than seventeen years old."

*D. The Federal Indictment of Daskal*

~~24.~~74. In the wake of the State Indictment of Daskal, federal investigators opened an investigation into Daskal in November 2018 (the "Federal Investigation").

~~25.~~75. The Federal Investigation resulted, among other things, in the initial federal indictment of Daskal on February 26, 2021 (the "Initial United States Indictment").

~~26.~~76. Daskal was criminally charged in the Initial United States Indictment with:

(i) Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. §§2444(b) and 3551;

(ii) Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. §§2423(b) and 355l; and

(iii) Travel with Intent to Engage in Illicit Sexual Activity, in violation of 18 U.S.C. §§2423(b) and 355 I.

~~27.~~77. Among other things, the Initial United States Indictment explicitly charged Daskal with "violations of New York Penal Law Sections 130.25 (2) (Rape in the Third Degree) and 130.40 (2) (Criminal Sex Act in the Third Degree), in that DASKAL engaged in sexual intercourse and oral sexual conduct with [Ms. Mandel], who had not yet attained the age of 17 years... using one or more facilities and means of interstate commerce."

~~28.~~78. While under federal indictment, Daskal, upon information and belief, recruited individuals to coerce, threaten, bribe and intimidate Ms. Mandel into ceasing to cooperate with federal agents and prosecutors. In other words, Daskal and others, including those identified

as defendants earlier in this Second Amended Complaint, orchestrated a multi-pronged campaign to "silence" Ms. Mandel.

~~29.~~79. Through the acts of the individuals and entities Daskal recruited while under indictment and awaiting trial scheduled for July 17, 2023, Daskal and other defendants identified earlier in this Amended Complaint sought to eviscerate the Government's prosecution of him by coercing, intimidating, and attempting to bribe Ms. Mandel into silence and withdrawal of assistance from the prosecution. Among other things, the individuals recruited by Daskal slashed the tires of Ms. Mandel's car and sought to have her meet with a New York lawyer named Arthur L. Aidala and receive as a bribe significant sums of money to dissuade her from testifying against Daskal.

~~30.~~80. Ms. Mandel, although she was placed in fear by the acts of the individuals recruited by Daskal and those associated with him, never wavered in her complete cooperation with federal agents and prosecutors and continued to prepare for the trial scheduled for July 17, 2023.

*E. The Conviction*

~~31.~~81. On July 14, 2023, three days before the jury selection scheduled for July 17, 2023, Breon Peace, the United States Attorney for the Eastern District of New York, filed a letter dated July 14, 2023 (the "U.S. Attorney's letter") with Judge Garaufis to "inform the Court" that the United States and defendant Daskal had "agreed that [Daskal] would plead guilty to the superseding indictment [filed on June 16, 2023] for transporting a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §2423(a), and be sentenced to a sentence within the Guidelines range of 168 to 210 months' imprisonment, fol1owed by a period of supervised release of five years."

~~32.~~82. In summarizing the "[p]rocedural [p]osture" of the prosecution, the U.S. Attorney's letter explained that Daskal "is charged on a two-count superseding indictment for using an interstate facility to engage in illicit sexual conduct, in violation of 18 U.S.C. §2423(b)... and transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §2423(a)... for sexually abusing a 15-year-old girl in his care when he was 58 years old."

~~33.~~83. According to the U.S. Attorney's letter, the "agreed-upon range of 168-210 *[i.e.,* 14 years to 17.5 years] months' imprisonment followed by a 5-year term of supervised release appropriately balances [Daskal's] criminal history and the seriousness of [Daskal's] conduct…"

~~34.~~84. Moreover, the U.S. Attorney's letter stressed that Daskal's conviction by guilty plea "carries a 10-year mandatory minimum... and the... plea accounts for this statutory mandatory minimum and ensures that [Daskal] appropriately faces punishment for the serious crimes he committed."

~~35.~~85. The U.S. Attorney's letter also emphasized "the need for a severe sentence for a very serious crime" against Ms. Mandel.

*F. Daskal's Guilty Plea*

~~36.~~86. On July 14, 2023, defendant Daskal entered a plea of guilty and Judge Garaufis accepted the plea. Judge Garaufis also set October 11, 2023, as the date for the sentencing of Daskal.

~~37.~~87. More specifically, as the full transcript of the July 14, 2023, guilty plea reveals, defendant Daskal admitted under oath to horrendous acts of criminal abuse of Ms. Mandel. Although Daskal's admissions were not full and completely candid, the transcript contains the following information confirming Daskal's criminal acts:

THE COURT [Judge Garaufis]: Mr. Daskal, do you understand, having been sworn to tell the truth, you must do so. If you were to deliberately lie in response to any question I ask you, you would face further criminal charges for perjury.

Do you understand that?

THE DEFENDANT: Yes.

• • *

THE COURT: Is your mind clear as you sit here today?

THE DEFENDANT: Yes.

THE COURT: ... Quote, Count 2: Transportation of a minor with intent to engage in criminal sexual activity. In or about August 2017 within the Eastern District of New York and elsewhere, the defendant, Jacob Daskal, did knowingly and intentionally transport [Ms. Mandel], an individual who had not yet attained the age of 18 years, in interstate commerce, to wit: From South Fallsburg, New York, through New Jersey, to Brooklyn, New York, with the intent that such individual [Ms. Mandel] engage in sexual activity for which a person *[i.e.,* Daskal] can be charged with a criminal offense, to wit: Violations of New York Penal Law Sections 130.25(2) (rape in the third degree), and 130.40(2) (criminal sexual act in the third degree) in that Daskal transported [Ms. Mandel]... from South Fallsburg, New York, through New Jersey to Brooklyn, New York... for the purpose of engaging in sexual intercourse and oral sexual conduct with [Ms. Mandel]....

* • *

THE COURT: Mr. Daskal, do you understand the elements of the crime that the Government would have to prove to a jury, beyond a reasonable doubt, and unanimously, in order to convict you of this crime, if you decided to go to trial?

THE DEFENDANT: Yes, Your Honor.

~~38.~~ 88. Furthermore, Judge Garaufis conducted a detailed allocution from Daskal.

As the Court clearly expressed the situation:

THE COURT: But I need to hear what he *[i.e.,* Daskal] has to say.

You know, I am not going to a store and buying something without seeing what it is. I need to see what he is going to allocute to and how....And then once I have satisfied that he has properly allocuted to it, I will accept his allocution and I will accept the plea subject to 11(c)(1)(C) and that will be the end of it.

• * •

THE COURT: I am not going to wait beyond today. It is going to happen today or we are going to trial...

So, are you ready to plead, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: ... Mr. Daskal, how do you plead to the charge contained in... the superseding indictment charging you with the transportation of a minor with intent to engage in criminal sexual activity[:] guilty or not guilty?

THE DEFENDANT: Guilty.

• *** •

THE COURT: ... At this time I would like you to tell me, in your own words, what you did to commit the crime charged [in] the superseding indictment.

THE DEFENDANT: In August 2017, I transported [Ms. Mandel], who I knew to be 15 years old, from South Fallsburg, New York to Brooklyn, New York through New Jersey, with intent to engage in oral sex with [Ms. Mandel]. I was 58 years old at the time.

G. *The Events at the Sentencing*

*(i) Overview of the Sentencing*

~~39.~~89. Viewed in perspective, the October 11, 2023, sentencing of Daskal was a spectacle which shed deplorable light on Daskal and the literally dozens of individuals who attended the sentencing as a macabre cheering section for Daskal.

~~40.~~90. In contrast, only the victim - Ms. Mandel herself - was present to bear witness to the truth and the interests of justice not just for herself but for multiple other women victims of Daskal and the callous community of his supporters and enablers. Significantly, several of the defendants identified in this Second Amended Complaint submitted letters as part of Daskal's sentencing memorandum. Among the additional defendants who submitted statements in support of Daskal were defendants C. Bornstein, E. Brody, Barry Daskal, B. Daskal, Benzion Daskal, C. Daskal, S. Daskal, P. Dembitzer, R. Teitelbaum, C. Fleischer on behalf of himself and defendant Yad Ephraim, Rabbi Pesach Greenberg (the founder of defendant Ezras Cholim Yad Ephraim), C. Halberstam, and defendant Ben Zion Halberstam (who described himself as the Grand Rabbi of the "Bobov Hassidic Dynasty and communities").

~~41.~~91. As Judge Garaufis perceptively emphasized during the course of the lengthy sentencing, not a single person among the legions of supporters of Daskal - a convicted felon - uttered a single word of empathy, sympathy or concern for Ms. Mandel.

*(ii) The Attempt of the Bobover Community to Intervene in the Sentencing*

~~42.~~92. Even as the sentencing proceedings began, the self-described "Bobover" community attempted to intervene in, and to delay, the sentencing of Daskal. In words that were highly revealing of the complicity of the defendants identified in this Second Amended Complaint in Daskal's conduct, an attorney retained on the very evening before the sentencing made these comments to Judge Garaufis (*see* sentencing transcript ("Tr.") at 6):

> Last evening, myself *[sic]* and [another lawyer] was *[sic]* approached by members of *the Bobover community,* and they *wanted to have an opportunity, as a community, to have their position heard as it relates to sentencing and Your Honor's obligation to take everything into consideration to arrive at a fair and just sentence.*
>
> Letters have been given, but not by the community as a whole, and I think it would be incumbent on Your Honor to get the

> position of the community... and to get input from... the membership in order for Your Honor to arrive at his decision... [Tr. 6-7 (emphasis supplied).]

~~43.~~93. Judge Garaufis rejected this gambit by the "Bobover community" to inject itself into the sentencing process and to delay the sentencing.

~~44.~~94. Furthermore, the members of the "Bobover community" who sought to intervene in and delay the sentencing included, among others, defendant B. Daskal, defendant P. Dembitzer, defendant L. Dembitzer, defendant C. Bornstein, defendant S. Bornstein, defendant C. Daskal, defendant E. Brody, defendant R. Teitelbaum, defendant Benzion Daskal, defendant S. Daskal, defendant Barry Daskal, ~~defendant C. Fischbein, defendant I. Fischbein~~, defendant Boro Park Shomrim, ~~defendant Bais Yaakov, defendant Mannes~~, defendant Rabbi Halberstam, ~~defendant C. Halberstam~~, defendant Shaarei Zion, ~~defendant Bobover,~~ defendant L. Brauner, ~~defendant Mutty Brauner, defendant Yad Ephraim, defendant Pesach Greenberg, defendant Yachad D'Bobov, and defendant Fleischer.~~

*(iii) The Court's Calculation of the Guideline Range*

~~45.~~95. After rejecting the "Bobover community's" attempt to intervene in and delay the sentencing, Judge Garaufis then turned the Court's attention to the proper calculation of the sentencing "guideline calculation" (Tr. at 8). Over substantial and unjustified opposition from Daskal's attorneys to the proper calculation, Judge Garaufis stressed the factors involving Daskal's crimes against Ms. Mandel (and possibly other victims) which bear special relevance to Ms. Mandel's action.

~~46.~~96. As Judge Garaufis stressed:

> THE COURT: [Daskal] pleaded guilty pursuant to an agreement, and under that agreement, the Government agreed to a specific sentence within the guideline range of 168 to 210 months....
>
> The Court has accepted the plea pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure....This Court does not normally accept such pleas because it constrains the Court's ability to properly sentence an individual who pleads guilty or is found guilty of certain crimes....
>
> So notwithstanding that, the Court must still ascertain the proper guideline, because the Court has an obligation under federal law to provide the guideline calculation, and there is a disagreement, I think, about what the appropriate guideline is in this case, so I'm going to go over the guideline calculation . . . [Tr. at 8.]

~~28.~~97. After commenting on the general point that Daskal disagreed with significant aspects of the Government's guideline calculation, Judge Garaufis commented that Daskal had "pleaded guilty to the superseding indictment charging transportation of a minor with intent to engage in criminal sexual activity. This count carries a ten-year minimum sentence so we start off with a 120 month sentence under the statute... Now, according to the Presentence Report, the base offense is a 28…." (Tr. at 9.)

~~47.~~98. Moreover, because of the nature of Daskal's crimes, Judge Garaufis noted: "Then there is a specific offense characteristic in paragraph 20 [of the Presentence Report]: Since the minor-victim in this case [*i.e.,* Ms. Mandel] was otherwise in the care and supervisory control of the defendant, the offense level is increased by two levels." (Tr. at 10.)

~~48.~~99. When Judge Garaufis mentioned that a further two-level enhancement should be added because of "the specific offense characteristic" that Daskal "unduly influenced the minor to engage in prohibited sexual conduct" (Tr. at 10), Daskal objected to that enhancement.

~~49.~~100. In response to that objection, the prosecution cogently stressed that "there are numerous additional facts to the defendant's influence over [Ms. Mandel], including [Daskal's]

position of power in their shared community, his relationships with law enforcement through the Shomrim, and their 44-year age difference…." (Tr. at 11.)

~~50.~~101. Judge Garaufis rejected Daskal's objection to the two-level enhancement, concluding that Daskal's "*status in his community activities with the police department and his status in the Borough Park Shomrim Society,* and the incredibly large age differential between a 15-year-old and a 59-year-old add up to sufficient grounds for including" the additional two-level enhancement. (Tr. at 11; emphasis supplied.)

~~51.~~102. Moreover, Daskal objected to a further two-level enhancement based on the fact that the "offense involved the use of a computer or an interactive computer service to provide, persuade, induce, entice, or coerce the minor [Ms. Mandel] to engage in prohibited sexual conduct." (Tr. at 12.)

~~52.~~103. As the prosecution succinctly expressed in responding to Daskal's objection, Daskal "used text messages, Skype, social media, to communicate with and groom [Ms. Mandel] before she lived with him, [and) during the time she lived with him, and afterwards, including when [Daskal] moved [Ms. Mandel) to Chicago." [Tr. at 13.]

~~53.~~104. In response to pertinent questioning from Judge Garaufis, the prosecution also stressed that through computer and other interactive devices Daskal "asked [Ms. Mandel] to pose nude for him and send him nude images over Skype " [Tr. at 13.]

~~54.~~105. As with other objections by Daskal to enhancements, Judge Garaufis overruled Daskal's objections based on computer usage. The Court accordingly added a further two-level enhancement. (Tr. at 14.)

~~55.~~106. Moreover, as alleged elsewhere on information and belief in this Second Amended Complaint, Daskal's crimes against Ms. Mandel were part of a pattern and practice of similar criminal behavior toward other women.

~~56.~~107. Specifically, Judge Garaufis, in referring specifically to the Presentence Investigation Report, cited the fact that the "offense of conviction is a covered sex crime and the defendant engaged in a pattern of activity involving prohibited sexual conduct [and] therefore *[Daskal] is a repeat and dangerous sex offender against minors."* (Tr. at 14; emphasis supplied.)

~~57.~~108. As the prosecution again successfully demonstrated, "there were multiple instances that could support the pattern enhancement." (Tr. at 18.)

~~58.~~109. Yet again Judge Garaufis rejected Daskal's objection. As the Court observed, *"I'm of the view that the widespread nature of the misbehavior should make it clear that this enhancement [regarding practice and pattern] is appropriate."* [Tr. at 18; emphasis supplied.] The Court thus imposed an additional five-level enhancement. *Id.*

*(iv) Ms. Mandel's Victim Impact Statement*

~~59.~~110. Ms. Mandel, when invited to do so, provided a detailed and moving Victim Impact Statement at the sentencing. The impact statement, which provides the most salient aspects of this Amended Complaint and contains stunning details as to the conduct not only of Daskal but the additional defendants identified in this Amended Complaint, was as fol1ows:

> I ended up leaving home at the age of 15. I was taken to Jacob Daskal's home, and he was the leader of the Brooklyn Shomrim patrol group. He offered to help me and I started feeling immense gratitude towards Mr. Daskal. I viewed him as my savior and father figure. Mr. Daskal kept in touch with me and eventually offered that I come live with his family. I was thrilled and unsuspectingly accepted his offer.
>
> I lived with Mr. Daskal and his wife for a couple of months. At the start, he was extremely nice and won my total trust, a process which I now know is called grooming.

When he explained why it is in my benefit to be touched, I believed and trusted him. The words "sex," "molestation" or "rape" had never entered my vocabulary. His initial physical affection quickly turned into full-fledged rape. While Mr. Daskal's nightly rape sessions caused a considerable amount of confusion and anguish, I insisted that I wanted to attend an out-of-town high school and Mr. Daskal reluctantly helped me transition to the Chicago community.

The weeks I spent in Chicago were the best weeks I have ever experienced in my life. I enjoyed school and was doing great in my studies. After a few short weeks Mr. Daskal came to visit me to check up on me. I am still not sure what the family I was boarding at thought of his visit and why they allowed it, but I soon found myself in the hotel room being raped all over again. When I returned home, a curious friend started probing me about our relationship. Since my friend was more educated than myself in areas of sexual relationships, she knew what questions to ask and after a lot of probing figured out some of what was happening between Mr. Daskal and me. My friend tattled on me to the principal of our school and to my horror, I was promptly kicked out for the religious violation of having sex. I still cannot fathom why no one reported this to the authorities.

I finally started to process what had happened to me. In an act of self-desperation, I tried to block Mr. Daskal out of my life. I enrolled in an online high school and focused on my studies. I completed my studies and received my high school diploma....

Mr. Daskal harassed me and was stalking me whenever I ventured outside. I turned to Amudim, an organization dedicated to helping people who are struggling with any type of abuse. The staff at Amudim was extremely supportive and walked me through the process of reporting the abuse and pressing charges against Mr. Daskal. Mr. Daskal was arrested the very next day. A silver lining in my difficult journey has been the knowledge that my reporting was a crucial step in removing a dangerous predator off the streets....

Although I am trying very hard to move forward in my life.. .it is something that I live with every day. What affected me the most was the fact that I was entrusted to Jacob Daskal's care as a minor and I trusted him to protect me and he violated that trust in the worst ways possible. This is something that has a major effect on my every relationship to this very day. I live with the trauma of what he has done to me physically and emotionally every day. My life will never be the same again. This horrendous experience has

shaped me in so many ways. The guilt and shame I live with are the worst feelings that eat at me day and night. And I know that what happened wasn't my fault. However, to live with the pain of knowing that you were stripped of your youth in such a vile and degrading way is something that stays with you forever.

I don't know how a man takes pleasure in raping and sexually abusing a young child as myself who knew nothing about sexual relations. Jacob Daskal is a very sick man. The pain he has caused me cannot adequately be put into words. When I look at my future, I do not see myself ever being able to be in a healthy trusting relationship with a man. I pray to God that it changes over time because I don't want to be stay alone for the rest of my life. This is all a result of the damage inflicted on me by Jacob Daskal. He wanted me to believe that I belonged to him and that he was going to control my entire life and that I was never going to be able to break free from his grasp. l thank our law enforcement for helping me get away from this man. But the repercussions are something I live with every day. The abuse was a lot more than just sexual abuse. He abused me mentally, emotionally, and sexually all the time fully aware of the fact that he was taking advantage of a vulnerable child. The crimes he committed against me are something that can never be undone. I will live with the pain of this trauma forever. [Tr. 20-24.]

*(v) Daskal's Further Admissions of Liability and Pleas for "Mercy"*

~~60.~~111. At the October 11 sentencing, Judge Garaufis gave Daskal himself the opportunity to address the Court before the imposition of the sentence. Daskal accepted that opportunity and, although pleading for "mercy," made unequivocal admissions of liability and responsibility for financial damage to Ms. Mandel.

~~61.~~112. Among other things, Daskal stated under oath at sentencing:

THE DEFENDANT: ... [The]first thing I want to say to the victim *[i.e.,* Ms. Mandel], I cannot express how sorry I am for what I did. I do not know [how] I can ever repay her for the terrible damage that I caused her. For a young girl, the harm that she has to deal with the rest of her life, words cannot capture... the overwhelming regret and shame for what I did.... *[W]hatever I feel is nothing compared to the awful pain I caused [Ms. Mandel].* Your Honor, I'm here to accept responsibility for my crime. *I took advantage of my position in Shomrim to do something unspeakable.* (Tr. 35-36; emphasis supplied.)

~~62.~~113. After these preliminary admissions, Daskal turned to a litany of self-justifying statements about the condition of his "elderly mother" (Tr. at 36), his allegedly ill wife (Tr. at 37), his conversations with his Rabbi (Tr. at 37), and his desire for forgiveness from God (Tr. at 37).

*(vi) The Court's View of the Failure of the Responsibility of the Community*

~~63.~~114. After listening to Daskal's statement in full, Judge Garaufis directed highly courageous and pertinent comments to the large group of Daskal's "community" supporters in the courtroom and elsewhere.

~~64.~~115. In salient part, Judge Garaufis stated:

> THE COURT: Let me start by stating that we would not be here today but for the courage of the victim [Ms. Mandel]. Had she not come forward, [Daskal's] crimes may never have come to light and he may have had the opportunity to prey on other young women in the community. It's horrible and unfair that the victim was forced into this position. She bore the immense burden for coming forward and disclosing the harm she suffered at the hands of a prominent member of her community. But bear this burden she did. The Court commends the victim for her remarkable strength and resilience. (Tr. at 38.)

~~65.~~116. Judge Garaufis' statement included the following:

> The Court agreed to accept this plea because the victim would be spared the need to testify in open court about what was done to her. And, in a sense - in a very great sense - the victim provided to the defendant the mercy the defense asks me to provide to the defendant. It is not my mercy that we must deal with here. It is the mercy that [Ms. Mandel] gave the defendant, because had this defendant gone to trial... his sentence could have been as long as life in prison [Tr. at 38.]

*(vii) Daskal's Wealth and the Complicity of the "Community"*

~~66.~~117. The Court's observations also encompassed other crucial issues of great relevance to Ms. Mandel's Amended Complaint: (i) Daskal's illicit transfer of wealth and (ii) the complicity of the "community" of which Daskal was a key leader:

THE COURT: [Daskal] was a man with intense power in his community. He was the leader of the Borough Park Shomrim Society, a crime patrol group with close ties to the New York City Police Department. *He managed a successful real estate company that brought him substantial wealth. He had a vast network of friends and family.* He was known and respected by many.

*I would point out that he placed over $10 million in assets ...for the benefit of his children and grandchildren. He was a wealthy man....*

And what did the defendant do with this power? He abused it to take advantage of a vulnerable young child in his community who was in great need of support because of her special circumstances in her own family and he did so in the most heinous manner imaginable. At every stage of this crime, [Daskal] abused his power. The victim was a 15-year-old and was brought to the defendant because he was an influential member of the community. She trusted him to provide her safe haven and support, looking to him as a father figure. Rather than providing this safe haven, the defendant abused her trust and groomed her for sex. [Tr. at 38-39; emphasis added.]

~~67.~~118. Significantly, Judge Garaufis made crucial observations about the role of the so-called "community" as a whole:

THE COURT: ... While the abuse was ongoing, he attempted to create a paper trail to protect himself, and when the victim finally realized what had been done to her, the defendant used his position of power to threaten and silence her.

I have read the sentencing memoranda.... I've also read the more than 20 letters submitted in support of Mr. Daskal. They paint a picture of the defendant as a pillar for his... community....

I find myself wondering how something like this could happen. *How the defendant's hideous crimes could go on for so long without someone stepping in to stop him and to help the victim? How could he inflict such damage believing he could get away with it?*

The defendant is clearly a sick man . . . . *He did not commit his crimes in a vacuum. Those who knew or suspected and did nothing, including family, friends, and clergy alike are also morally at fault.* Those who did not believe the victim or chose to look away, including educators, among others, are morally at fault. Those

> who enabled Mr. Daskal are morally at fault. Those who punished the victim when she came forward are morally at fault.
>
> *This is a community and the community has to take responsibility and not hide from responsibility.* The purpose of fostering community cohesion should be working to support and protect the weak and the vulnerable, not to empower and enable wrongdoers who take advantage of those who need our help the most.
>
> The Court hopes that any community members who in any way allowed this to happen or who helped the defendant evade responsibility for so long are listening today and that they repent for their role in these events. The Court hopes that this community makes sure that we never have to find ourselves wondering how something like this could happen to a girl who courageously came forward to protect herself and to hold the defendant accountable at such a vulnerable stage in her life. [Tr. at 40-41; emphasis supplied.]

119. Upon information and belief, the members of the "community" identified by Judge Garaufis as bearing "responsibility" include, among others to be located through discovery proceedings, defendants B. Daskal, P. Dembitzer, L. Dembitzer, C. Bornstein, S. Bornstein, C. Daskal, E. Brody, R. Teitelbaum, Benzion Daskal, S. Daskal, Barry Daskal, ~~C. Fischbein, I. Fischbein~~, Boro Park Shomrim, ~~Bais Yaakov, Mannes~~, Rabbi Halberstam, ~~C. Halberstam~~, Shaarei Zion, ~~Bobover~~, L. Brauner, ~~Mutty Brauner~~, ~~Yad Ephraim, Pesach Greenberg, Yachad D'Bobov, and Fleischer~~.

~~68.~~

**FIRST CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. §2255**
**AGAINST DEFENDANT DASKAL**

~~69.~~120. Plaintiff repeats and realleges each and every allegation of ¶¶1-91, *supra*.

~~70.~~ Defendant Daskal has violated the provisions of 18 U.S.C. §2255 and is thus liable to Ms. Mandel for compensatory damages and "punitive damages" in an amount to be determined by trial ~~but believed to exceed $150 million~~.

~~13.~~ Defendant Daskal violated 18 U.S.C. § 2423(a) and pleaded guilty to that crime. ~~The additional~~

defendants identified in this Amended Complaint are individually liable under 18 U.S.C. §2255 as a consequence of their knowledge of, aiding and

121. As a direct result of his repeated rapes of Ms. Mandel, defendant Daskal has damaged Ms. Mandel in an amount to be determined at jury trial.

abetting, enabling and concealing the conduct of defendant Daskal for compensatory damages and "punitive damages" in favor of Ms. Mandel in an amount to be determined at trial but believed to exceed $150 million.

**COUNT II**[JM1]
**(Repeated Instances of Rape of a Minor)**

71. Plaintiff repeats and realleges each and every allegation ofT\11-94, *supra.*

72. Defendant Daskal repeatedly raped and injured Ms. Mandel in violation of New York State law and United States law.

73. As a direct result of his repeated rapes of Ms. Mandel, defendant Daskal has damaged Ms. Mandel in an amount to be determined at jury trial but believed to exceed $150 million.

**COUNT III**
**(Repeated Acts of Sexual Abuse)**

74. Plaintiff repeats and realleges each and every allegation offfl-97, *supra.*

75. Defendant Daskal committed multiple acts of sexual abuse against Ms. Mandel in violation of New York State law and United States law.

76. As a direct result of his repeated sexual abuse of Ms. Mandel, defendant Daskal has damaged Ms. Mandel in an amount to be determined at jury trial but believed to exceed $150 million.

**SECOND CAUSE OF ACTION**
**REPEATED ACTS OF ASSAULT**
**AGAINST DEFENDANT DASKAL**

IOI. Plaintiff repeats and realleges each and every allegation of mJl-100, *supra.*

122. Plaintiff repeats and realleges each and every allegation of mJl-100the above paragraphs, *supra.*

123. Defendant Daskal repeatedly raped and injured Ms. Mandel in violation of New York State law and United States law.

124. Defendant Daskal committed multiple acts of sexual abuse against Ms. Mandel in violation of New York State law and United States law.

125. Defendant Daskal committed multiple acts of assault against Ms. Mandel in violation of New York State law and United States law.

126. As a direct result of his repeated assaults on Ms. Mandel, defendant Daskal has damaged Ms. Mandel in an amount to be determined at jury trial.

**THIRD CAUSE OF ACTION**
**REPEATED ACTS OF BATTERY**
**AGAINST DEFENDANT DASKAL**

103. Plaintiff repeats and realleges each and every allegation of,r,it-103of the above paragraphs, *supra.*

104. Defendant Daskal committed repeated acts of battery against Ms. Mandel in violation of state and federal law.

105. As a direct result of his acts of battery against Ms. Mandel, defendant Daskal has damaged Ms. Mandel in an amount to be determined at jury trial., but believed to exceed

105. $150 million.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT DASKAL**
**I**

106. Plaintiff repeats and realleges each and every allegation ~~of,iJt-106~~of the above paragraphs, *supra.*

107. Defendant Daskal's conduct caused severe emotional distress to Ms. Mandel.

108. As a direct result of Daskal's conduct, Daskal has damaged Ms. Mandel in an amount to be determined at jury trial ~~but believed to exceed $150 million~~.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF NYC ADMIN. CODE §10-1104 ("GMVA")**

**AGAINST DEFENDANT DASKAL**

109. Plaintiff repeats and realleges each and every allegation of the above paragraphs.

110. The above-described conduct of Defendant Daskal, including but not limites to, Defendant Daskal's sexual assaults and rapes of Ms. Mandel constitutes a "crime of violence" and a "crime of violence motivated by gender" against Ms. Mandel as defined by the New York City Gender Motivated Violence Act N.Y.C. Admin. Code § 8-903 (2017).

111. The above-described conduct of Defendant Daskal, including but not limited to, Defendant Daskal's sexual assaults and rapes of Ms. Mandel, constitutes a "crime of violence" against Ms. Mandel motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

112. Defendant Daskal committed "crimes of violence" against Ms. Mandel because she was a girl (now a woman) and, at least in part, because he has an unlawful animus towards women.

113. Defendant Daskal's gender-motivated animus towards women is

demonstrated by, among other things, his sexually violent and abusive treatment of Ms. Daskal, women and girls other than Ms. Daskal including his own wife, and other women in his community as described above.

114. As a direct and proximate result of the aforementioned gender-motivated violence, Ms. Mandel has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

115. Defendant Daskal's gender-motivated violence against Ms. Mandel entitles her to punitive damages and an award of attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**

**VIOLAION OF NYC ADMIN. CODE §10-1104 ("GMVA")**

**AGAINST THE INDIVIDUAL ENABLER DEFENDANTS AND**

**INSTITUTIONAL ENABLER DEFENDANTS**

116. Plaintiff repeats and realleges each and every allegation of the above paragraphs.

117. These Defendants directed, enabled, participated in, and conspired to commit gender-based violence against Ms. Mandel.

118. As a direct and proximate result of the aforementioned gender-motivated violence, and aiding, abetting, and enabling by the Individual and Institutional Enabler Defendants, Ms. Mandel has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

119. Defendant Daskal was able to engage in his gender-motivated violence against Ms. Mandel due to the protection, cover, cooperation, and enabling of the Individual and

Institutional Defendants as described herein, therefore entitling Ms. Mandel to punitive damages and an award of attorneys' fees and costs.

120. The Individual and Institutional enabler Defendants knew, or reasonably should have known, of Defendant Daskal's propensity for abuse.

121. The Individual and Institutional enabler Defendants failed to take appropriate action of implement reasonable policies to protect potential victims including but not limited to Ms. Mandel.

122. The Individual and Institutional enabler Defendants owed Ms. Mandel a duty of care and breached that duty through their inaction including but not limited to failing to remove Mr. Daskal from his position where he was given access to potential victims.

123. The Individual and Institutional Enabler Defendants were therefore negligent.

**SEVENTH CAUSE OF ACTION**
**PURSUANT TO SECTION 273 OF**
**THE UNIFORM VOIDABLE TRANSACTIONS ACT**
**FRAUDULENT CONVEYANCE/TRANSFER**
**AGAINST DEFENDANT DASKAL AND THE TRANSFEREE DEFENDANTS**

124. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

125. The Uniform Voidable Transactions Act ("UVTA") §273 states that

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor; (i) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were reasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they came due.

126. Defendants violated the section cited herein as set forth.

127. Plaintiff is entitled to the maximum amount allowed under this statute or its predecessor statute, the UFCA, depending on when the transfer occurred.

**EIGHT CAUSE OF ACTION**
**PURSUANT TO SECTION 274(a) and (b) OF**
**THE UNIFORM VOIDABLE TRANSACTIONS ACT**
**FRAUDULENT CONVEYANCE/TRANSFER**
**AGAINST DEFENDANT DASKAL AND THE TRANSFEREE DEFENDANTS**

128. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

129. The Uniform Voidable Transactions Act ("UVTA") §274(a) states:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

130. The Uniform Voidable Transactions Act ("UVTA") §274(b) states:

A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

131. Defendants violated the section cited herein as set forth.

132. Plaintiff is entitled to the maximum amount allowed under this statute or its predecessor statute, the UFCA, depending on when the transfer occurred.

**NINTH CAUSE OF ACTION**
**PURSUANT TO SECTION 276-a OF**
**THE UNIFORM VOIDABLE TRANSACTIONS ACT**
**ATTORNEYS FEES**
**AGAINST DEFENDANT DASKAL AND THE TRANSFEREE DEFENDANTS**

133. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

134. The Uniform Voidable Transactions Act Section 276-a permits the award of attorney's fees as an additional amount required "to satisfy the creditors' claim."

135. Plaintiff is entitled to the maximum amount allowed under this statute or its predecessor statute, the UFCA, depending on when the transfer occurred.

**TENTH CAUSE OF ACTION**
**PURSUANT TO SECTION 277**
**THE UNIFORM VOIDABLE TRANSACTIONS ACT**
**TRANSFEREE LIABILITY**
**AGAINST DEFENDANT DASKAL AND THE TRANSFEREE DEFENDANTS**

136. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

137. The Uniform Voidable Transactions Act Section 277 permits a creditor to recover judgment for the value of the asset transferred or the amount necessary to satisfy the creditor's claim, whichever is less.

138. Judgment may be entered against the first transferee of the asset or the person for whose benefit the transfer was made.

139. Plaintiff is entitled to the maximum amount allowed under this statute or its predecessor statute, the UFCA, depending on when the transfer occurred.

108.

WHEREFORE, plaintiff Rivka Mandel demands judgment as follows:

A. On Count I, in an amount to be determined at trial but believed to exceed $150 million;

B. On Count II, in an amount to be determined at trial but believed to exceed $150 million;

C. On Count III, in an amount to be determined at trial but believed to exceed $150 million;

D. On Count IV, in an amount to be determined at trial but believed to exceed $150 million;

E. On Count V, in an amount to be determined at trial but believed to exceed $150 million;

F. On Count VI, in an amount to be determined at trial but believed to exceed $150 million;

G. Punitive damages in the amount of $200 million;

H. Injunctive and other equitable relief directing the additional defendants to disgorge and transfer to Ms. Mandel all assets transferred to the additional defendants by defendant Daskal, in an amount to be determined by the Court but believed to exceed $150 million; and

I. Such other and further relief as the Court deems just and proper.